47 A.3d 737

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. SHAREEF
EDMONDS, DEFENDANT–RESPONDENT.

Argued January 18, 2012—Decided July 26, 2012.

118

*Joie D. Piderit,* Assistant Prosecutor, argued the cause for appellant (*Bruce J. Kaplan,* Middlesex County Prosecutor, attorney).

*John G. Koufos* argued the cause for respondent (*Koufos and Norgaard,* attorneys).

*Frank Muroski,* Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (*Jeffrey S. Chiesa,* Attorney General, attorney).

*Mark K. Silver* argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey (*Coughlin Duffy,* attorneys; *Mr. Silver* and *Michael J. Sullivan,* of counsel and on the brief).

Justice ALBIN delivered the opinion of the Court.

The police responded to an unverified 9–1–1 call reporting "a domestic dispute possibly involving a handgun" at a Carteret residence. Outside her apartment, Kamilah Richardson told the police that there was no problem in her home and that her eleven-year-old son was inside alone. Against her will, the police entered the apartment to assure the safety of the young boy. The police found him unharmed, without any visible injuries or signs of distress and no indication of a domestic disturbance inside the apartment. The police removed defendant Shareef Edmonds from an adjoining room, where he was watching television, and frisked him. Without evidence to corroborate the earlier domestic-violence report and without first securing a warrant, the police searched the area where defendant had been seated. A handgun was found under a pillow. Defendant, who was charged with the unlawful possession of the gun, claimed that the warrantless search yielding the weapon was unconstitutional.

The trial court agreed, determining that the search of the home without a warrant was objectively unreasonable and could not be justified by either the emergency-aid or community-caretaking exception to the constitutional warrant requirement. The court suppressed the gun, and the Appellate Division affirmed.

We now hold that sufficient credible evidence in the record supports the trial court's ruling. The search of a home without a warrant is presumptively unreasonable. Once the police deter-

mined that there was inadequate evidence to corroborate the report of domestic violence, and the parties' safety was not an issue, there was no objectively reasonable basis to conduct a search under either the community-caretaking or emergency-aid doctrine. At that point, to conduct a search of Ms. Richardson's home, the police had to apply for a warrant based on probable cause.

## I.

## A.

Defendant Shareef Edmonds was charged in separate indictments with second-degree unlawful possession of a .38 caliber handgun, *N.J.S.A.* 2C:39-5(b), and second-degree possession of the same handgun by a person previously convicted of a crime, *N.J.S.A.* 2C:39-7(b). Defendant moved to suppress the gun, claiming that it was seized during an unconstitutional search of the apartment where he had been visiting.

The Honorable Frederick P. De Vesa, P.J.Cr., conducted a suppression hearing. The State and defendant agreed that the facts were not in dispute and stipulated to the factual recitation in the report of Carteret Police Officer Marcus Rosario. No witnesses were called at the hearing. The evidence of record reveals the following.

Shortly before 1:00 a.m. on January 16, 2008, the Roselle Park Police Department received a 9-1-1 call from a person who identified himself as "John Smith."[1] He stated, "I'm calling for my sister. I believe that her boyfriend is beating her up and he

---

[1] The State has provided in the appendix to its brief a copy of the 9-1-1 tape. Although Judge De Vesa did not state that he listened to the 9-1-1 call, or read a transcript of it, in his ruling he repeats virtually identical language from that call. It seems clear that, in one form or another, Judge De Vesa reviewed the 9-1-1 call. We quote from the actual contents of the 9-1-1 conversation because it is not only the best evidence, but also consistent with the stipulated facts in Officer Rosario's report.

got a gun." "Smith" gave his sister's name as Kamilah Richardson and her address as 22 Mary Street in Carteret. He claimed to have no telephone number where he could be contacted, and ended the conversation saying, "My brother-in-law is picking me up. I'm on my way out there now."[2] The record does not indicate that "Smith" ever arrived at the scene.

At 12:54 a.m., Carteret Police Officer Marcus Rosario and three other officers were dispatched "to 22 Mary Street 2nd floor to investigate a domestic dispute possibly involving a handgun." Officer Rosario's report notes that the "third party caller" made a report to the Roselle Park Police Department and claimed to be "John Smith[,] the victim's brother."

On their arrival, the officers were met by Ms. Richardson at the downstairs door. She told the officers "that there was no problem at the residence" and refused to give consent to their entering her apartment. The officers were apparently insistent on entering her home, and she became "noticeably agitated," repeatedly stating that she did not want the police in her apartment and "that there was no problem." In response to a question from Officer Rosario, Ms. Richardson claimed that only her eleven-year-old son, Elijah, was in the apartment. The officers advised Ms. Richardson that they "were going to check her residence for any other possible occupants," even though she was blocking their way. Ms. Richardson started walking upstairs, saying that she wanted to talk to her son before the police entered. She was advised that "due to the nature of the call" the police would have to enter the apartment first. Officer Rosario, who proceeded up the stairs with two other officers, discovered that the door was locked. Again, Ms. Richardson denied that anyone other than her son was in the apartment. Elijah was told to unlock the door, and he did so.

---

[2] One of the attorneys represented to Judge De Vesa that Roselle Park is approximately nine miles from Carteret.

When Officer Rosario stepped into the residence, Elijah was standing in the living room. At that time, Officer Rosario observed a television playing in a room to his left. With his gun drawn, he entered that room and observed a person known to him as Shareef Edmonds. Defendant "was sitting in a chair in front of the television," and to his left a mattress was on the floor. Officer Rosario ordered defendant "to stand up, put his hands up, and exit the room." Defendant was patted down for weapons, but none were found. Two officers then stood by defendant as Officer Rosario returned to the adjacent room and searched the "immediate area" where defendant had been watching television. Under a pillow lying on the mattress, Officer Rosario discovered a loaded .38 caliber revolver. Officer Rosario secured the weapon, stepped back into the living room, and asked who owned the gun. Defendant immediately replied, "[I]t's mine." Defendant then was arrested for unlawful possession of the weapon.

While still at the apartment, Ms. Richardson explained that she had been having ongoing problems with her ex-boyfriend, G.S. According to Ms. Richardson, just a day earlier, G.S. had left a telephone message threatening to kill both her and her son. She insisted that defendant had not engaged in any act of domestic violence. Ms. Richardson was arrested for obstruction of justice.[3]

## B.

Based on the record, Judge De Vesa determined that: the officers had a duty to go to the Richardson residence in response to the 9-1-1 call reporting possible domestic violence; the officers were not required to accept Ms. Richardson's representation that there was "no problem" at the residence; and the officers acted reasonably by further investigating and entering the apartment to ensure the safety of eleven-year-old Elijah. However, viewing the

---

[3] Ms. Richardson was indicted for fourth-degree obstructing the administration of justice, N.J.S.A. 2C:29-1, and third-degree hindering the apprehension or prosecution of defendant, N.J.S.A. 2C:29-3(a). Ms. Richardson participated in the suppression hearing but is not a party to this appeal.

"totality of the circumstances," Judge De Vesa determined that the warrantless search of the room where Officer Rosario found the gun exceeded the permissible scope of the emergency-aid doctrine as discussed in *State v. Frankel*, 179 *N.J.* 586, 598, 847 *A.*2d 561, *cert. denied*, 543 *U.S.* 876, 125 *S.Ct.* 108, 160 *L.Ed.*2d 128 (2004). He came to that conclusion for a number of reasons.

After Elijah opened the apartment door, the officers did not report that the boy appeared injured or in distress in any way. Nothing in the police report suggests that the officers questioned Elijah before defendant was secured, led from the other room, and patted down. The frisk of defendant yielded no weapons. Additionally, "there was no demonstrable evidence of ... domestic violence" inside the apartment. Thus, the objective evidence "began to dispel the existence of an emergency."

Judge De Vesa observed that before conducting a search of the apartment, if the officers had "further concerns they could [have] simply escorted Mrs. Richardson or the boy[ ] outside from the home and questioned them." Judge De Vesa also considered it significant that the 9-1-1 operator "made no attempt to ... corroborate the nature of call" that led to the dispatch of the officers to the Richardson residence and that the officers never asked Ms. Richardson if she had a brother named "John Smith." To Judge De Vesa's mind, "a certain level of diligence" is required before searching a home without a warrant.

Judge De Vesa acknowledged that the officers had acted "reasonably up to a point." However, after the frisk of defendant failed to uncover a weapon, and without corroborative evidence of domestic violence, Judge De Vesa ruled that the officers could not "reasonably conclude that there was an emergency that required them to search the home" without a warrant. That was so because Ms. Richardson and her son could have been moved to another location for their protection while the police attempted to secure a warrant. Viewing the totality of the circumstances, Judge De Vesa concluded that the police were "looking for evidence" of a crime after defendant was frisked and secured.

Because the police were acting outside of the scope of the emergency-aid doctrine, Judge De Vesa ordered the suppression of the gun.

## C.

The Appellate Division granted leave to appeal and, in an unpublished opinion, concurred with Judge De Vesa's "conclusion that the search was not justified under the emergency aid doctrine." The panel, however, remanded to the trial court to consider whether the warrantless search was permissible under the community-caretaking doctrine outlined in *State v. Bogan*, 200 *N.J.* 61, 975 *A.*2d 377 (2009), which was decided after the court rendered its decision. The panel noted that "[o]n remand, the trial court, in its discretion, may reopen the record for testimony."

## D.

On remand, the State did not seek to expand the record by offering testimony. Judge De Vesa therefore decided the legal issue based on the stipulated record. He concluded that the police officers—responding to an unverified telephone call—fulfilled their community-caretaking function after they were assured by Ms. Richardson that there was no domestic-violence problem, after they observed that she and her son had no discernible injuries and that her son was not in distress, and after seeing for themselves that defendant did not "appear to be engaged in any unlawful activity." According to Judge De Vesa, the officers "exceeded the scope of their community caretaking duties" when they conducted a warrantless search designed "to uncover evidence of criminality" rather than "to promote the safety of [Ms. Richardson] or her son." He did not find the present facts comparable to *Bogan*, in which a limited entry into a residence to ensure the safety of a young child was justified under the community-caretaking doctrine. Thus, the gun remained suppressed.

### E.

The Appellate Division, after granting leave to appeal, affirmed again in an unpublished opinion. The panel agreed that *Bogan* was not on point. It found that "Judge De Vesa's factual findings were based on the evidence presented to him and inferences reasonably drawn from that evidence." It concluded that "[i]f the police believed that they had probable cause to search the apartment, they had the option of applying for a search warrant, either in person or by telephone."

We granted the State's motion for leave to appeal. *State v. Edmonds*, 206 *N.J.* 70, 18 *A.*3d 1032 (2011). We also granted the motions of the Attorney General and the Association of Criminal Defense Lawyers of New Jersey (ACDL) to participate as amici curiae.

### II.

The State argues that both the emergency-aid and the community-caretaking doctrines broadly empower the police to enter a dwelling without a warrant: "The emergency aid doctrine permits police officers to enter a residence after receiving a 9-1-1 call" and "[t]he community caretaking doctrine authorizes police officers to enter a residence unbidden to perform a 'clear community caretak[ing] responsibility....'" (Quoting *Bogan, supra,* 200 *N.J.* at 77, 975 *A.*2d 377). According to the State, three primary factors gave the police authority "to conduct a reasonable but limited in scope search for a gun" while in the apartment: the 9-1-1 call reporting domestic violence; Ms. Richardson's effort to block the officers from entering her residence; and her untruthful statement that only her son was there. The State insists that "there was no evidence to support the trial court's finding that [Officer] Rosario was in an evidence-gathering mode." Thus, "exigent circumstances still required the police to perform their caretaker role to protect [Ms. Richardson], Elijah and themselves from firearms." Amicus Attorney General similarly argues that the limited search of the apartment for weapons was reasonable

and therefore calls for the reversal of the Appellate Division decision.

In response, defendant basically restates the reasons given by the trial court for rejecting the emergency-aid and community-caretaking doctrines as justifications for the warrantless search of the apartment. Defendant emphasizes several facts to refute the suggestion that there was an ongoing emergency and to reinforce the court's conclusion that the search of the apartment had turned into a criminal investigation: Ms. Richardson's denial that there was a domestic-violence problem; no objective signs of a disturbance inside the residence; and no discernable injuries to anyone. Amicus ACDL similarly maintains that the search was not justified. The ACDL submits that when the police searched the room, there was no longer an emergency-aid purpose as Ms. Richardson, the boy, and defendant were all separated and secured. The ACDL likewise maintains that a warrantless search of a home is not justified under the guise of the emergency-aid and community-caretaking doctrines absent some form of real and imminent danger. Although the ACDL does not dispute the right of the police to enter the apartment in this case, it submits that the police cannot use those doctrines as "a pretext to conduct a warrantless search when they do not otherwise have probable cause to do so."

## III.

The State bears the burden of proving by a preponderance of the evidence the validity of a warrantless search. *State v. Wilson*, 178 *N.J.* 7, 12–13, 833 *A.*2d 1087 (2003).[4] The suppression motion was decided on a stipulated record. The facts are not in

---

[4] The trial court apparently misspoke by suggesting at the first suppression hearing that the beyond-a-reasonable-doubt standard applied. The State did not object at the time or in its briefs to the Appellate Division or this Court. That would suggest that the State did not consider this to be a real issue. The Attorney General first raised this issue in its amicus curiae submissions to this Court.

dispute. The issue, therefore, is whether the trial judge properly concluded that the State did not carry its burden in proving the constitutionality of the warrantless search.

## IV.

■ The Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution, in virtually identical language, guarantee "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . and no Warrants shall issue, but upon probable cause." *U.S. Const.* amend. IV; *see also N.J. Const.* art. I, ¶ 7. Historically, federal and state courts have "applied a more stringent standard of the Fourth Amendment to searches of a residential dwelling." *State v. Bruzzese,* 94 *N.J.* 210, 217, 463 *A.*2d 320 (1983), *cert. denied,* 465 *U.S.* 1030, 104 *S.Ct.* 1295, 79 *L.Ed.*2d 695 (1984). That is so because "[t]he sanctity of one's home is among our most cherished rights." *Frankel, supra,* 179 *N.J.* at 611, 847 *A.*2d 561; *see also State v. Evers,* 175 *N.J.* 355, 384, 815 *A.*2d 432 (2003) ("The privacy interests of the home are entitled to the highest degree of respect and protection in the framework of our constitutional system. . . ."). Indeed, "[t]he very core of the Fourth Amendment and Article 1, Paragraph 7 protects the right of the people to be safe within the walls of their homes, free from governmental intrusion." *Frankel, supra,* 179 *N.J.* at 611, 847 *A.*2d 561; *see also Bogan, supra,* 200 *N.J.* at 72, 975 *A.*2d 377 ("Deterring unreasonable governmental intrusion into a person's home is one of the chief goals of the Fourth Amendment and Article I, Paragraph 7.").

■ Our constitutional jurisprudence expresses a clear preference for government officials to obtain a warrant issued by a neutral and detached judicial officer before executing a search. *Frankel, supra,* 179 *N.J.* at 597–98, 847 *A.*2d 561. Thus, "[w]arrantless searches, particularly in a home, are presumptively unreasonable" and "must be subjected to particularly careful scrutiny." *State v. Bolte,* 115 *N.J.* 579, 583, 585, 560 *A.*2d 644 (1989).

Because a warrantless search is presumptively invalid, the State must establish that such a search was justified by one of the " 'few specifically established and well-delineated exceptions' to the warrant requirement." *Frankel, supra*, 179 *N.J.* at 598, 847 *A.*2d 561 (quoting *Mincey v. Arizona*, 437 *U.S.* 385, 390, 98 *S.Ct.* 2408, 2412, 57 *L.Ed.*2d 290, 298–99 (1978)).

In this case, the State invokes two of those exceptions to justify the warrantless search of Ms. Richardson's apartment—the emergency-aid and community-caretaking doctrines. Keeping in mind "the careful scrutiny" that must be given to a warrantless search of a home, we turn first to see whether the actions of the police were justified under the emergency-aid doctrine.

## V.

### A.

■■■■ "The emergency aid doctrine is derived from the commonsense understanding that exigent circumstances may require public safety officials, such as the police, firefighters, or paramedics, to enter a dwelling without a warrant for the purpose of protecting or preserving life, or preventing serious injury." *Ibid.* Thus, "a warrant is not required to break down a door to enter a burning home to rescue occupants or extinguish a fire, to prevent a shooting or to bring emergency aid to an injured person." *Id.* at 600, 847 *A.*2d 561 (quoting *Wayne v. United States*, 318 *F.*2d 205, 212 (D.C.Cir.) (internal quotation marks omitted), *cert. denied*, 375 *U.S.* 860, 84 *S.Ct.* 125, 11 *L.Ed.*2d 86 (1963)). In such cases, "[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Ibid.* (quoting *Wayne, supra*, 318 *F.*2d at 212) (internal quotation marks omitted); *see also State v. Garbin*, 325 *N.J.Super.* 521, 524–27, 739 *A.*2d 1016 (App.Div.1999) (upholding police officer's warrantless entry of garage from which smoke was coming after report of fire), *certif. denied*, 164 *N.J.* 560, 753 *A.*2d 1153 (2000).

In *State v. Frankel,* we employed a three-part test for determining whether a warrantless search is justified by the emergency-aid doctrine. *See Frankel, supra,* 179 *N.J.* at 600, 847 *A.*2d 561; *see also State v. Cassidy,* 179 *N.J.* 150, 161, 163, 843 *A.*2d 1132 (2004). Under this test,

 the public safety official must have an objectively reasonable basis to believe that an emergency requires that he provide immediate assistance to protect or preserve life, or prevent serious injury;

[2] his primary motivation for entry into the home must be to render assistance, not to find and seize evidence; and

 there must be a reasonable nexus between the emergency and the area or places to be searched.

[*Frankel, supra,* 179 *N.J.* at 600, 847 *A.*2d 561 (citing *Cassidy, supra,* 179 *N.J.* at 161, 843 *A.*2d 1132) (footnote omitted).]

The genesis of this standard is *People v. Mitchell,* 39 *N.Y.*2d 173, 177–78, 383 *N.Y.S.*2d 246, 347 *N.E.*2d 607 (1976), a New York Court of Appeals decision that was later adopted by both state and federal courts alike. *See State v. Scott,* 231 *N.J.Super.* 258, 275, 555 *A.*2d 667 (App.Div.1989) (Ashbey, J.A.D., concurring in part and dissenting in part), *rev'd on dissent,* 118 *N.J.* 406, 571 *A.*2d 1304 (1990); *see, e.g., United States v. Cervantes,* 219 *F.*3d 882, 890 (9th Cir.2000); *State v. Mountford,* 171 *Vt.* 487, 769 *A.*2d 639, 645 (2000).

In light of recent federal precedent, we conclude that the second factor in the emergency-aid test set forth in *Frankel,* which addresses the officer's subjective motivation, is no longer consonant with Fourth Amendment jurisprudence. Since *Frankel,* the United States Supreme Court has made clear that, in the emergency-aid context, the subjective motivation of a police officer is irrelevant in determining whether a search or seizure is unreasonable under the Fourth Amendment. *Brigham City v. Stuart,* 547 *U.S.* 398, 404–05, 126 *S.Ct.* 1943, 1948, 164 *L.Ed.*2d 650, 658 (2006). Rather, the test is simply one of objective reasonableness— viewing the circumstances objectively, were the actions of the officer justified. *Ibid.; Michigan v. Fisher,* 558 *U.S.* 45, ——, 130 *S.Ct.* 546, 548, 175 *L.Ed.*2d 410, 413 (2009) ("This 'emergency aid exception' does not depend on the officers' subjective intent or the

seriousness of any crime they are investigating when the emergency arises. It requires only 'an objectively reasonable basis for believing,' that 'a person within [the house] is in need of immediate aid.' " (citations omitted)).[5]

The Ninth and Tenth Circuits had a three-part emergency-aid test—almost identical to the one in *Frankel*—and eliminated the subjective-motivation factor in the wake of *Brigham City. United States v. Snipe*, 515 *F*.3d 947, 951–52 (9th Cir.2008); *United States v. Najar*, 451 *F*.3d 710, 718 (10th Cir.2006).[6] We now do the same to align our jurisprudence with federal law.

 Therefore, for a warrantless search to be justified by the emergency-aid doctrine, the State must prove only that (1) the officer had "an objectively reasonable basis to believe that an emergency requires that he provide immediate assistance to protect or preserve life, or to prevent serious injury" and (2) there was a "reasonable nexus between the emergency and the area or places to be searched." *See Frankel, supra*, 179 *N.J.* at 600, 847 *A*.2d 561.

Although this Court's decision in *Frankel* was based on both the Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the State Constitution, *see id.* at 597–600, 847 *A*.2d 561, we decline defendant's invitation to retain the subjective-motivation factor as part of our state-constitutional jurisprudence.

---

[5] After oral argument before this Court, we requested that the State and defendant answer the question whether the second factor in the *Frankel* test was inconsistent with the federal emergency-aid doctrine enunciated in *Brigham City* and *Fisher*. Both parties replied that the subjective-motivation factor was not a relevant consideration under the Fourth Amendment.

[6] Other federal circuit courts of appeal have explicitly rejected the subjective motivation of an officer as a relevant factor in determining whether a search was justified under either the emergency-aid or exigent-circumstances exception to the warrant requirement. *See, e.g., Hunsberger v. Wood*, 570 *F*.3d 546, 554 (4th Cir.2009); *United States v. Klump*, 536 *F*.3d 113, 118–19 (2d Cir.2008); *United States v. Troop*, 514 *F*.3d 405, 409 (5th Cir.2008); *United States v. Bell*, 500 *F*.3d 609, 615 (7th Cir.2007); *United States v. Valencia*, 499 *F*.3d 813, 815 (8th Cir.2007); *United States v. Huffman*, 461 *F*.3d 777, 782–83 (6th Cir.2006).

First, *Frankel* made no distinction between federal and state law in addressing the contours of the emergency-aid doctrine. *See ibid.* Second, our Article I, Paragraph 7 jurisprudence primarily has eschewed any consideration of the subjective motivations of a police officer in determining the constitutionality of a search or seizure. *See State v. Bruzzese,* 94 *N.J.* 210, 219, 463 *A.*2d 320 (1983) (holding that under Article I, Paragraph 7, "the proper inquiry for determining the constitutionality of a search-and-seizure is whether the conduct of the law enforcement officer who undertook the search was objectively reasonable, without regard to his or her underlying motives or intent"), *cert. denied,* 465 *U.S.* 1030, 104 *S.Ct.* 1295, 79 *L.Ed.*2d 695 (1984); *State v. Brown,* 205 *N.J.* 133, 146, 14 *A.*3d 26 (2011). Third, since *Frankel,* we have rejected the subjective motivation of the officer as a legitimate consideration in our search-and-seizure analysis. *See State v. O'Neal,* 190 *N.J.* 601, 613–14, 921 *A.*2d 1079 (2007) (noting that action is reasonable "regardless of the individual officer's state of mind, as long as the circumstances, viewed objectively, justify [the] action. The officer's subjective motivation is irrelevant." (quoting *Brigham City, supra,* 547 *U.S.* at 404, 126 *S.Ct.* at 1948, 164 *L.Ed.*2d at 658) (internal quotation marks omitted)). In *O'Neal,* we referred approvingly to the objectively reasonable test in both *Brigham City* and *Bruzzese. Ibid.* Last, we do not believe that the elusive attempt to plumb the subjective motivations of an officer will meaningfully advance either the privacy interests of an individual or the ultimate determination of whether a particular search or seizure was unreasonable under state law.

In sum, if police officers "possess an objectively reasonable basis to believe" that prompt action is needed to meet an imminent danger, then neither the Fourth Amendment nor Article I, Paragraph 7 demand that the officers "delay potential lifesaving measures while critical and precious time is expended obtaining a warrant." *See Frankel, supra,* 179 *N.J.* at 599, 847 *A.*2d 561. We must keep in mind that the emergency-aid doctrine is an exception to the warrant requirement; it is not a general grant of authority

to conduct warrantless searches. The emergency-aid doctrine, particularly when applied to the entry of a home, must be "limited to the reasons and objectives that prompted" the need for immediate action. *Ibid.* Therefore, "[a] police officer entering a home looking for a person injured or in danger may not expand the scope of the search by peering into drawers, cupboards, or wastepaper baskets." *Ibid.* When the exigency that justifies immediate action dissipates, the rationale for searching without a warrant is no longer present. *See United States v. Doe,* 61 *F.*3d 107, 111 (1st Cir.1995) (stating that "once an exigency ends … a *neutral judicial officer* must authorize any subsequent search on a showing of probable cause"); *Higdon v. Wells County Sheriff's Office,* 426 *F.Supp.*2d 854, 862–863 (N.D.Ind.2006) (noting that "if exigent circumstances existed, once the exigency was eliminated" a warrant was required).

### B.

Emergency-aid cases that prompt warrantless searches are animated by exigent circumstances. Several examples illustrate this point. In *Brigham City,* police officers, responding to a call about a loud party at a residence, observed through a screen door and windows a brawl between a juvenile and several adults in a kitchen. 547 *U.S.* at 400–01, 126 *S.Ct.* at 1946, 164 *L.Ed.*2d at 656. In particular, the officers witnessed the juvenile strike an adult with such force that the victim was "spitting blood into a nearby sink." *Id.* at 401, 126 *S.Ct.* at 1946, 164 *L.Ed.*2d at 656. The officers opened the screen door and announced their presence. When the tumult continued, they entered to stop the altercation. *Ibid.* The United States Supreme Court upheld the warrantless entry of the home because "the officers had an objectively reasonable basis for believing both that the injured adult might need help and that the violence in the kitchen was just beginning." *Id.* at 406, 126 *S.Ct.* at 1949, 164 *L.Ed.*2d at 659.

In *Fisher,* police officers responding to a disturbance complaint and a report of a man " 'going crazy,' " observed through a house

window the defendant " 'screaming and throwing things.' " 558 *U.S.* at ——, 130 *S.Ct.* at 547, 175 *L.Ed.*2d at 412. House windows and fence posts were broken, and the officers noticed blood on the smashed hood of a pick-up truck in the driveway. *Ibid.* Inside, the officers could see that the defendant "had a cut on his hand." *Ibid.* The officers knocked on the door and asked if he needed medical attention. *Ibid.* The defendant responded with profanity and told the officers to get a search warrant. *Ibid.* When one officer pushed the front door partway open, the defendant pointed a gun at him. *Ibid.* The Supreme Court found the warrantless entry objectively reasonable under the emergency-aid exception because "it was reasonable to believe that Fisher had hurt himself ... and needed treatment that in his rage he was unable to provide, or that Fisher was about to hurt, or had already hurt, someone else." *Id.* at ——, 130 *S.Ct.* at 549, 175 *L.Ed.*2d at 414.

In *Frankel*, we applied the emergency-aid test in upholding a search that uncovered a large quantity of drugs. 179 *N.J.* at 595–96, 847 *A.*2d 561. There, an open line 9–1–1 call was received from a telephone number listed in the defendant's name. *Id.* at 609, 847 *A.*2d 561. The police dispatcher dialed back that number but heard only a busy signal. *Ibid.* A police officer was sent to the defendant's home to investigate because an open line 9–1–1 call gives rise to a presumptive emergency. *Ibid.* While explaining that no 9–1–1 call was made from his home, the "defendant was unusually nervous and agitated and stumbling over his words." *Ibid.* Moreover, oddly, a sheet obstructed the officer's view into the interior of the house. *Ibid.* The officer had the dispatcher dial again the defendant's telephone number, which once more yielded a busy signal. *Id.* at 594–95, 609, 847 *A.*2d 561. This "reinforced in the officer's mind the very real potential that a victim was incapacitated in the home." *Id.* at 609, 847 *A.*2d 561. Despite the defendant's refusal to give the officer consent to enter his home, we found that the officer "had an objectively reasonable and good-faith basis to believe that an emergency was at hand that could not brook delay." *Id.* at 610, 847 *A.*2d 561. The officer was " 'able to point to specific and articulable facts which, taken

together with rational inferences from those facts, reasonably warrant[ed]' his entry into defendant's home under the emergency aid doctrine." *Ibid.* (quoting *Terry v. Ohio*, 392 *U.S.* 1, 21, 88 *S.Ct.* 1868, 1880, 20 *L.Ed.*2d 889, 906 (1968)). Importantly, the officer limited his search to the scope of the emergency and only looked in "areas where a person or body could be located." *Ibid.* In affirming the search, we noted that *Frankel* was "a close case." *Id.* at 611, 847 *A.*2d 561.

Unlike the present case, in *Brigham City, Fisher,* and *Frankel,* the police were responding to an ongoing emergency in which, based on the circumstances, the officers had an objectively reasonable belief that immediate action was needed to avert potentially serious harm to an individual, and that the delay in securing a warrant was not an option.

## C.

It bears repeating that in this case, the police response to a report of possible domestic violence involving a gun at the Richardson residence was triggered by a 9-1-1 caller whose identity was questionable and whose information was never corroborated. We must keep in mind the United States Supreme Court's admonition in *Florida v. J.L.*, 529 *U.S.* 266, 272, 120 *S.Ct.* 1375, 1379, 146 *L.Ed.*2d 254, 261 (2000), that there is not an "automatic firearm exception to [the] established reliability analysis" of an anonymous tip.

In *J.L.*, the police received an anonymous tip that a young black man at a bus stop was carrying a handgun. *Id.* at 268, 120 *S.Ct.* at 1377, 146 *L.Ed.*2d at 258–59. When the police went to the bus stop, they found three black males, including the defendant who basically fit the description in the tip. *Id.* at 268, 120 *S.Ct.* at 1377, 146 *L.Ed.*2d at 259. The defendant was stopped and frisked, and a handgun was found in his pocket. *Ibid.* In suppressing the gun, the Court determined that the stop and frisk were not based on reasonable and articulable suspicion. *Id.* at 271, 120 *S.Ct.* at 1379, 146 *L.Ed.*2d at 260–61. That was so because the anonymous

call "left the police without means to test the informant's knowledge or credibility," *id.* at 271, 120 *S.Ct.* at 1379, 146 *L.Ed.*2d at 260, and because the accurate description of the subject's location and appearance did "not show that the tipster ha[d] knowledge of concealed criminal activity," *id.* at 272, 120 *S.Ct.* at 1379, 146 *L.Ed.*2d at 261. Significantly, the Court noted that "[t]he reasonableness of official suspicion must be measured by what the officers knew before they conducted their search." *Id.* at 271, 120 *S.Ct.* at 1379, 146 *L.Ed.*2d at 260. The discovery of the gun, after the fact, did "not suggest that the officers ... had a reasonable basis for suspecting J.L. of engaging in unlawful conduct." *Ibid.*

With this jurisprudence as our backdrop, we now turn to the facts and conclusions reached by the trial court in the present case. We must not forget that the State bore the burden of justifying the warrantless search and that a failure of proof would require suppression. Ultimately, we must determine whether there is sufficient credible evidence in the record to sustain the trial court's ruling that the search exceeded the scope of the emergency-aid exception to the warrant requirement.

## VI.

The search at issue was set in motion by a 9-1-1 call made from a pay telephone in Roselle Park by a person who identified himself as "John Smith" and who said he "believe[d] that [his sister's] boyfriend is beating her up and he got a gun." Mr. "Smith" left no contact information, and therefore his identity was unverifiable. Nor did he reveal the source of his knowledge about the alleged events occurring miles away in Carteret. The call therefore in many ways resembled the anonymous tip in *J.L.* Nevertheless, the police had a duty to investigate an allegation of domestic violence involving a gun. In this case, the scope of a reasonable intrusion or search, of course, depended on what the officers found on their arrival at the scene.

Based on the 9-1-1 call, four Carteret police officers were dispatched to the Richardson residence at approximately 1:00 a.m.

Ms. Richardson—the reported domestic violence victim—met the officers outside her apartment. She did not exhibit any injuries and denied that there was any problem. The officers were not required "to give uncritical acceptance" to her denials, or honor her objections that they not enter her home, given that her eleven-year-old son was inside and might be endangered. *See Frankel, supra,* 179 *N.J.* at 609, 847 *A.*2d 561. The officers had a duty to ensure that Elijah was safe. Once Elijah opened the door, the officers observed that he was not harmed, and the record does not suggest that he was in distress or the apartment in disarray. The officers did not question Elijah. Instead, Officer Rosario proceeded with his gun drawn to an adjacent room where defendant was watching television. Defendant's presence necessarily aroused suspicion because Ms. Richardson had denied that anyone other than her son was present in the apartment. However, defendant was not engaged in any criminal or even suspicious activity when observed by Officer Rosario. Officer Rosario led defendant out of the adjacent room. Defendant was frisked, and no weapons were found on him.

In the record, there is no suggestion that either Ms. Richardson, her son, or defendant were questioned about the report of domestic violence, or that anything about their or the apartment's appearance corroborated a scene of domestic violence.[7] At the apartment, the police did not have an identifiable victim. Nothing in the record suggests that Ms. Richardson was asked whether she had a brother named "John Smith."[8] The police did not ask Ms. Richardson for permission to search her residence for a gun,

---

[7] The dissent rhetorically asks what corroboration could be satisfactory. *Post* at 151 n. 1, 47 *A.*3d at 757 n. 1. We need not catalog the indicia of domestic violence that would serve as corroborative evidence. Suffice it to say, there was a complete absence of any corroborative details of domestic violence, a point fairly made by the trial court.

[8] Interestingly, Ms. Richardson did tell the police that a former boyfriend just a day earlier had left a telephone message threatening to kill both her and Elijah.

and the State does not argue that the police had probable cause to do so.

In *J.L.*, an anonymous tip—a young man with a gun at a bus stop—and the later identification of the defendant at the bus stop fitting the tipster's description were insufficient to justify a stop and frisk for a weapon. That being so, it is a stretch to argue that the unverified tip in this case, which resulted in the entry of a home, the lack of corroboration of an incident of domestic violence, and the failure to find any weapons on defendant, justified the warrantless search of a home. The report of a firearm in an anonymous tip does not establish, by itself, the reliability of the tip. *J.L., supra,* 529 *U.S.* at 272, 120 *S.Ct.* at 1379–80, 146 *L.Ed.*2d at 261. Otherwise, "any person seeking to harass another [could] set in motion an intrusive, embarrassing police search of the targeted person simply by placing an anonymous call falsely reporting the target's unlawful carriage of a gun." *Ibid.*

As Judge De Vesa indicated, the police must exercise "a certain level of diligence" before searching a home without a warrant. With the parties separated and secured and their safety not at issue, Judge De Vesa indicated the police could have sought a warrant. He did not find that the police officers had an "objectively reasonable basis to believe" that there was an ongoing emergency threatening life. Indeed, he concluded that the officers could not "reasonably conclude that there was an emergency that required them to search the home" without a warrant. Thus, the State fell short of satisfying an essential element of the emergency-aid doctrine. *See Frankel, supra,* 179 *N.J.* at 600, 847 *A.*2d 561.[9]

---

[9] Although Judge De Vesa found that the State failed to establish the second *Frankel* factor, the "primary motivation" for the search was to "render assistance, not to find and seize evidence," *see Frankel, supra,* 179 *N.J.* at 600, 847 *A.*2d 561, as noted earlier, that factor is irrelevant. The State is not disadvantaged because we now hold it had to satisfy just two rather than three factors of the emergency-aid test.

We do not take issue with the immediate response of the police to the 9-1-1 call. Domestic violence is an acute problem in our society. Allegations of domestic violence, even if coming from a seemingly anonymous source, cannot be breezily dismissed and must be investigated. The police had a duty to look behind the denials by Ms. Richardson while her son remained potentially in jeopardy in the apartment. *See Wildoner v. Borough of Ramsey*, 162 *N.J.* 375, 392-93, 744 *A.2d* 1146 (2000) (recognizing that victims of domestic violence are not always forthcoming with police). Therefore, we do not question the decision made by the police to enter the home to assure Elijah's safety. We will assume that the detention and frisk of defendant was proper. But once there was no longer an objective basis to believe that an emergency was at hand, "[t]he privacy interests of the home [were] entitled to the highest degree of respect...." *Evers, supra,* 175 *N.J.* at 384, 815 *A.2d* 432.[10]

We warned in *Frankel* that the unique facts that led to the home entry in that case under the emergency-aid doctrine should not be "over read." 179 *N.J.* at 611, 847 *A.2d* 561.[11] The extension of that doctrine in this case would eviscerate the special status of the home as a protected sanctuary in our constitutional framework. As stated earlier, the warrantless search of a home is

[10] The dissent seemingly suggests that an anonymous 9-1-1 call, say, one made from a telephone booth as in this case, has the same reliability as a call that can be traced to the caller. *Post* at 151-52, 47 *A.3d* at 757. The enhanced reliability given to 9-1-1 calls is because such calls can be traced and the people who made those calls know they can be traced. *State v. Golotta,* 178 *N.J.* 205, 218-19, 837 *A.2d* 359 (2003). We cannot conclude—as the dissent does—that the 9-1-1 call was "substantially verified" before the undertaking of the search of the television room. *See post* at 151-52, 47 *A.3d* at 757-58. At the scene, there was no evidence that an act of domestic violence had occurred.

[11] Our dissenting colleague argues that the police officers acted reasonably in the search for a weapon in the television room. *Post* at 153-54, 47 *A.3d* at 758-59. The dissent omits that defendant had been removed from that room and secured by the police before the search. The dissent does not articulate the nature of the emergency that allowed for the warrantless search. The dissent does not even suggest that there was probable cause for the search.

presumptively unreasonable. The trial court and Appellate Division both found that the State did not meet its burden to overcome that presumption.[12] We do not see any basis to overthrow Judge De Vesa's ruling, or reverse the judgment of the Appellate Division on this ground.

## VII.

■ Next, we must determine whether the community-caretaking exception to the warrant requirement justified the search of Ms. Richardson's home. The community-caretaking doctrine recognizes that police officers provide "a wide range of social services" outside of their traditional law enforcement and criminal investigatory roles. *Bogan, supra,* 200 *N.J.* at 73, 975 *A.2d* 377; *see also Cady v. Dombrowski,* 413 *U.S.* 433, 441, 93 *S.Ct.* 2523, 2528, 37 *L.Ed.2d* 706, 714–15 (1973). These social-welfare activities include, among other things, protecting the vulnerable from harm and preserving property. *Bogan, supra,* 200 *N.J.* at 73, 975 *A.2d* 377. In performing these tasks, typically, there is not time to acquire a warrant when emergent circumstances arise and an immediate search is required to preserve life or property. This narrow exception to the warrant requirement has been applied to such circumstances as allowing the police to conduct a warrantless search of a car to locate a gun that was missing from a police officer, *Cady, supra,* 413 *U.S.* at 435–37, 442–43, 93 *S.Ct.* at 2525–26, 2528–29, 37 *L.Ed.2d* at 711–12, 715–16, to perform a "welfare check" of a vehicle that was parked in an area known for suicides and whose last authorized driver was listed as a missing person, *State v. Diloreto,* 180 *N.J.* 264, 270, 280–82, 850 *A.2d* 1226 (2004), and to set foot in an apartment to ascertain the welfare of a child who was home from school, with no apparent excuse, in a residence that had been the site of an alleged sexual assault earlier that day, *Bogan, supra,* 200 *N.J.* at 65, 975 *A.2d* 377. The

---

[12] The State chose twice to proceed on a stipulated record. This case suggests the attendant problems of not presenting live testimony.

community-caretaking functions in these cases were permissible without a warrant because they were "divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *See Cady, supra,* 413 *U.S.* at 441, 93 *S.Ct.* at 2528, 37 *L.Ed.*2d at 714–15.

In *Bogan,* we specifically acknowledged that "[t]he community caretaking role of the police also extends to protecting the welfare of children." 200 *N.J.* at 75, 975 *A.*2d 377. In that case, police officers were taken to an apartment by a fourteen-year-old girl who claimed she had been sexually molested there. *Id.* at 78, 975 *A.*2d 377. When the police rang the doorbell to the second-floor apartment, a boy, appearing to be twelve years old and wearing pajamas, answered the door. *Ibid.* On a day when he would have been expected to be in school, the young boy told the police that he was home alone, even though a male voice could be heard in the background. *Ibid.* The boy "appeared nervous and uneasy" and gave inconsistent answers to simple questions concerning the whereabouts of his mother. *Ibid.* When the telephone rang inside the apartment's kitchen, the boy picked up the receiver and told the officers it was his father. *Ibid.* A police sergeant asked if he could speak with the boy's parent. *Ibid.* The boy agreed, and only then did the sergeant step into the apartment to take the telephone, while the other officers remained in the hallway. *Ibid.* From the sergeant's vantage point in the kitchen, he saw the defendant—who fit the description of the alleged sexual predator—in another room. *Id.* at 79, 975 *A.*2d 377. The defendant was arrested. *Ibid.*

We found that the "carefully modulated response of the officers, and of [the sergeant] in particular," was "objectively reasonable." *Id.* at 80, 975 *A.*2d 377. Importantly, *Bogan* did not involve the search for evidence or a weapon in a home. The police entered the apartment simply to speak with a parent by telephone to assure a child's safety and well-being. The entry for that limited purpose fell within "the well-accepted limits of the community caretaking exception to the warrant requirement." *Ibid.*

■ The facts in this case stand in stark contrast to those in *Bogan*. Here, the police entered Ms. Richardson's apartment, secured the parties, and detained and frisked defendant in response to the 9-1-1 call. There was no objective evidence that the residence had been the scene of domestic violence or that Ms. Richardson or her son were endangered. Having investigated and failed to corroborate the report of domestic violence, the police officers had fulfilled their community-caretaking function. If the officers wished to search the apartment for a gun, they had to apply for a warrant supported by probable cause.

The community-caretaking doctrine is an exception to the warrant requirement, not a roving commission to conduct a nonconsensual search of a home in the absence of exigent circumstances. We recently affirmed that approach in *State v. Kaltner*, by rejecting an expansive interpretation of the community-caretaking doctrine to justify a warrantless search of a home where an off-campus college party was disturbing the neighborhood. 420 *N.J.Super.* 524, 22 *A.*3d 77 (App.Div.2011), *aff'd o.b.*, 210 *N.J.* 114, 114, 41 *A.*3d 736 (2012). The Appellate Division held, and we agreed, that the officers' initial entry into the house to abate the noise was within their role as community caretakers. *Id.* at 544, 22 *A.*3d 77. The "full-blown search of the house," which revealed drugs in a third-floor bedroom, was not in keeping with that role. *Ibid.* Ultimately, the scope of the search was not "reasonably related" to the circumstances that brought the police to the premises—curbing the noise and issuing summonses to the offending parties. *Ibid.*

We note that the federal circuit courts of appeal have split on whether the community-caretaking doctrine—first addressed in *Cady*, a car search case—applies to a search of a home.[13] In *Ray*

---

[13] The Fifth, Sixth, and Eighth Circuits have held that the community-caretaking doctrine in *Cady* is applicable to home searches. *United States v. Quezada*, 448 *F.*3d 1005, 1007–08 (8th Cir.2006); *United States v. Rohrig*, 98 *F.*3d 1506, 1521–22 (6th Cir.1996); *United States v. York*, 895 *F.*2d 1026, 1029–30 (5th Cir.1990). The Seventh, Ninth, and Tenth Circuits have declined to extend the

*v. Township of Warren*, 626 *F*.3d 170 (3d Cir.2010), the Third Circuit explicitly rejected any extension of *Cady* to the search of a home. *Id.* at 177 ("We agree with the conclusion of the Seventh, Ninth, and Tenth Circuits . . . and interpret the Supreme Court's decision in *Cady* as being expressly based on the distinction between automobiles and homes for Fourth Amendment purposes. The community caretaking doctrine cannot be used to justify warrantless searches of a home.").

Our narrow application of the doctrine in *Bogan*, in which the police engaged in the limited entry of a home as a child welfare and safety measure, struck the appropriate balance between the proper community-caretaking role of the police and the right of our citizens to be left alone in their homes free from warrantless government intrusions. Our approach in *Bogan* is not inconsistent with *Ray* because, there, the Third Circuit acknowledged that "[c]ircumstances involving the protection of a child's welfare . . . may present an exigency permitting warrantless entry, but only if the officer reasonably believes that 'someone is in *imminent* danger.' " *Id.* at 177 (quoting *Parkhurst v. Trapp*, 77 *F*.3d 707, 711 (3d Cir.1996)).[14]

In the present case, the findings of the trial court that the police conducted a home search that exceeded the permissible boundaries of the community-caretaking doctrine are supported by sufficient credible evidence in the record.

## VIII.

For the reasons expressed, we affirm the judgment of the Appellate Division, which upheld the trial court's suppression of

---

community-caretaking doctrine as a justification for a home search. *United States v. Bute*, 43 *F*.3d 531, 535 (10th Cir.1994); *United States v. Erickson*, 991 *F*.2d 529, 531 (9th Cir.1993); *United States v. Pichany*, 687 *F*.2d 204, 207–09 (7th Cir.1982).

14 We see no need to weigh in on the split among the federal circuits.

the handgun as the fruit of an unconstitutional search of a home. We remand for proceedings consistent with this opinion.

Justice PATTERSON, dissenting.

In this case, police officers responded to a 9–1–1 emergency call about a possible incident of domestic violence in which the potential victim was identified as the caller's sister and the reported abuser was said to be armed. Police officers arriving at the scene were met outside of the residence by Kamilah Richardson, the woman who had been named by the caller. Ms. Richardson, insisting that there had been no domestic violence and that the sole occupant of her apartment was her young son, refused to permit the officers into the apartment and became agitated when they repeatedly sought permission to enter the home. Allowed into the apartment by the child, the officers quickly discovered that Ms. Richardson had misinformed them when she stated that her son was alone. Defendant Shareef Edmonds was in the apartment with the child.

The majority concludes that the officers were justified in entering the home and searching the defendant under the emergency aid exception to the warrant requirement under a streamlined test which conforms our prior holding in *State v. Frankel*, 179 *N.J.* 586, 598–600, 847 *A.*2d 561, *cert. denied*, 543 *U.S.* 876, 125 *S.Ct.* 108, 160 *L.Ed.*2d 128 (2004), to recent decisions of the United States Supreme Court, *Michigan v. Fisher*, 558 *U.S.* 45, 130 *S.Ct.* 546, 175 *L.Ed.*2d 410 (2009), and *Brigham City v. Stuart*, 547 *U.S.* 398, 126 *S.Ct.* 1943, 164 *L.Ed.*2d 650 (2006). *Ante* at 139–40, 47 *A.*3d at 750. However, the majority holds that the police officers were not justified by either the emergency aid doctrine or the community-caretaking doctrine when they took an additional step: a limited search of the area immediately surrounding the chair on which the defendant was sitting. Affirming the findings of the trial court on a stipulated record, the majority concludes that the police officers' search was not conducted to protect the community's safety, but to

find evidence. *Ante* at 139–41, 144–45, 47 *A.*3d at 749–51, 753. I respectfully disagree.

I.

The trial court's findings were premised upon a stipulated record consisting of a single document, the police report prepared by Officer Marcus Rosario on January 16, 2008. The police report's brief account of the critical events supports the objective reasonableness of the officers' actions. The report initially notes that police dispatch was informed of an anonymous 9-1-1 call from "John Smith" reporting domestic abuse against his sister, possibly involving a firearm. Officers were dispatched to the address given by the anonymous caller. Officer Rosario, one of the responding officers, wrote:

> Upon our arrival we were met at the downstairs door by the victim, Kamilah Richardson, who stated that there was no problem at the residence. [Ms. Richardson] refused to allow us past her in order to go upstairs and began to become noticeably agitated. She continuously stated that she did not want us in her apartment and that there was no problem. When I asked [Ms. Richardson] who was upstairs, she advised me that only her 11 year old son [ ] was home with her. When we advised her that we were going to check her residence for any other possible occupants she immediately began to walk up the stairs, stating that she was going to talk to her son before we entered. She was then advised that due *to the nature of the call she would not be allowed to enter the residence prior to us.* At this time I proceeded upstairs along with officers Singura and Reyes. Upon reaching the apartment door it was discovered that it had been locked. [Ms. Richardson] was again asked if anyone else was in the residence, to which she replied "no only my son." [The child] was then advised to unlock the door, which after a short time, he did.

According to Officer Rosario, he and his fellow officers immediately discovered that Ms. Richardson's repeated assurances that the child was alone in the apartment were false:

> Upon entering the residence I observed [the child] standing in the living room and a television on in the room to my direct left. At this time I entered the room with my gun drawn and observed an individual, known to this officer as Shareef Edmonds. Shareef was sitting in a chair in front of the television with a mattress on the floor to his left. At this time Shareef was ordered to stand up, put his hands up, and exit the room. Shareef was then pat searched for weapons, which yielded negative results.

It was then that the officers made the decision to conduct the limited search at the center of this case:

> Officers Reyes and Singura then stood by with Shareef as I searched the immediate area where he was seated. At this time I located a loaded black Taurus .38 cal revolver [identifying serial number] on the mattress under a pillow, which was located within arms reach of Shareef. I then secured the firearm and stepped into the living room where Shareef was now standing and asked who[se] gun it was, to which Shareef immediately replied "it's mine."

Officer Rosario then described the defendant's arrest and Ms. Richardson's statements suggesting that the firearm belonged to a former boyfriend, whom she accused of threatening her and her son. Officer Rosario's account constitutes the entire record on which the trial court's decision was based.

## II.

I would find the circumscribed search conducted by Officer Rosario and the other police officers in this case to be justified under both the emergency aid doctrine and the community-caretaking doctrine. Both of those doctrines turn upon an evaluation of the purpose and scope of the officers' decision to embark upon an immediate search rather than to delay the investigation pending the issuance of a warrant.

As the majority states, the emergency aid doctrine applies in the presence of an objectively reasonable basis for the officer to believe that there is an emergency that requires immediate assistance to protect life and prevent serious injury. *Ante* at 133–34, 47 *A.*3d at 746–47; *Frankel, supra,* 179 *N.J.* at 600, 847 *A.*2d 561. There must also be a reasonable nexus between the emergency and the area that is searched. *Frankel, supra,* 179 *N.J.* at 600, 847 *A.*2d 561. A search justified under the emergency aid doctrine must be constrained to the reasons and objectives that prompted the need for immediate action by the officers involved. *Id.* at 599, 847 *A.*2d 561.

Similarly, the community-caretaking doctrine turns on the foundation for the officers' action; "the community caretaking responsibility must be a real one, and not a pretext to conduct an

otherwise unlawful warrantless search." *State v. Bogan,* 200 *N.J.* 61, 77, 975 *A.*2d 377 (2009). The reviewing court does not consider "whether the police could have done something different," but determines "whether their actions, when reviewed as a whole, were objectively reasonable." *Id.* at 81, 975 *A.*2d 377. If an officer acted in a manner that is objectively reasonable, in legitimate pursuit of a recognized community-caretaking objective—in *Bogan,* the protection of a child from a potential sexual predator—the community-caretaking doctrine will justify the warrantless search. The doctrine recognizes that the community-protection and investigatory roles of police officers are often intertwined. Indeed, in *Bogan,* this Court declined to "handcuff police officers from fulfilling a clear community caretaking responsibility, particularly one that might prevent imminent harm to a child, merely because the officers are engaged in a concurrent criminal investigation." *Id.* at 77, 975 *A.*2d 377.

## III.

Thus, this Court's jurisprudence regarding both of the doctrines at issue requires an evaluation of the objective reasonableness of the officers' conduct. Here, the police conduct must be viewed in its context: a 9-1-1 call summoning the officers to investigate an alleged threat of domestic violence involving an armed abuser, a woman and a child.

Our Legislature has recognized that domestic disputes present unique law enforcement challenges. In enacting the Prevention of Domestic Violence Act, *N.J.S.A.* 2C:25-17 to -35, the Legislature found "that there are thousands of persons in this State who are regularly beaten, tortured and in some cases even killed by their spouses or cohabitants." *N.J.S.A.* 2C:25-18. Recognizing that "previous societal attitudes concerning domestic violence have affected the response of our law enforcement and judicial systems," the Legislature directed a strong and comprehensive law enforcement response to domestic violence:

> It is the intent of the Legislature to stress that the primary duty of a law enforcement officer when responding to a domestic violence call is to enforce the laws allegedly violated and to protect the victim.... It is further intended that the official response to domestic violence shall communicate the attitude that violent behavior will not be excused or tolerated, and shall make clear the fact that the ... [A]ct will be enforced without regard to the fact that the violence grows out of a domestic situation.
>
> [*Ibid.*]

The Legislature expressed its intent "to assure the victims of domestic violence the maximum protection from abuse the law can provide." *Ibid.; see also Cesare v. Cesare,* 154 *N.J.* 394, 398–99, 713 *A.*2d 390 (1998) (noting Legislature's objective that law enforcement and judicial system " 'generate a prompt response in an emergency situation' " (quoting *N.J.S.A.* 2C:25–18)).

The Legislature has thus given our law enforcement community a clear mandate: to vigorously combat domestic violence and protect its victims from harm. That mandate places police officers in situations that are dangerous to both the victims of domestic violence and the officers themselves. Courts have "recognized the combustible nature of domestic disputes." *Tierney v. Davidson,* 133 *F.*3d 189, 197 (2d Cir.1998); *see also United States v. Martinez,* 406 *F.*3d 1160, 1164 (9th Cir.2005) (noting that "more officers are killed or injured on domestic violence calls than on any other type of call" (quotation omitted)).

The mission assigned by the Legislature to our State's police officers necessitates nuanced decisions on how best to protect victims of domestic violence, who may deny or conceal abuse. As the United States Court of Appeals for the First Circuit stated,

> [o]n the spot reasonable judgments by officers about risks and dangers are protected. Deference to those judgments may be particularly warranted in domestic disputes. In those disputes, violence may be lurking and explode with little warning. Domestic violence victims may be intimidated or suffer from a dependence inherent in the abusive relationship. The signs of danger may be masked.
>
> [*Fletcher v. Town of Clinton,* 196 *F.*3d 41, 50 (1st Cir.1999).]

Likewise, in *Wildoner v. Borough of Ramsey,* this Court recognized that law enforcement's task in combating domestic violence

is confounded by the unwillingness of many victims to report abuse:

It is well documented that, for a number of reasons, victims of domestic violence often do not report their abuse to law enforcement officers. Many victims deny the abuse when questioned. According to estimates from National Crime Victimization Survey data, only fifty-six percent of battering incidents are reported to police. Other research suggests that the reporting rate is even lower, and that as few as seven to fourteen percent of battering incidents are reported. Accounts of concerned citizens—often neighbors—who have seen or heard domestic violence nearby, and who report it to the police, are therefore a crucial tool in combating domestic violence.

[162 *N.J.* 375, 392–93, 744 *A.*2d 1146 (2000) (citations omitted).]

Police officers, who may be reliant upon 9–1–1 emergency calls for information about abuse, must make instantaneous decisions about whether or not to enter and search the homes of victims. *See United States v. Black,* 482 *F.*3d 1035, 1040 (9th Cir.) ("This is a case where the police would be harshly criticized had they not investigated and [the victim] was in fact in the apartment. Erring on the side of caution is exactly what we expect of conscientious police officers."), *cert. denied,* 552 *U.S.* 1023, 128 *S.Ct.* 612, 169 *L.Ed.*2d 395 (2007); *United States v. Lawrence,* 236 *F.Supp.*2d 953, 964 (D.Neb.2002) ("Police must often make balanced choices, but domestic violence situations require police to make particularly delicate and difficult judgments quickly."). In short, an officer investigating a report of domestic violence faces a daunting challenge: protecting the victim, as our Legislature requires, without igniting a potentially lethal confrontation with an alleged abuser. It was in just such a setting that this case arose.

## IV.

In my view, the officers whose conduct is at issue in this case acted in an objectively reasonable manner to protect a woman and child from reported abuse, and to forestall what could have been a violent encounter. I consider the limited search conducted in this case to easily meet the standard for the emergency aid exception set forth by the majority, *ante* at 132–34, 47 *A.*3d at 746–47, and to

be well within the parameters set in *Bogan, supra,* 200 *N.J.* at 77, 975 *A.*2d 377, for a search of a residence based upon the community-caretaking exception to the warrant requirement.

The officers acted in response to a 9–1–1 call made by an individual who was obviously familiar with the potential victim and her residence. He stated that the alleged victim was his sister, and gave an exact address for her apartment that turned out to be correct. Most importantly, the caller specifically reported on a threat of domestic violence involving a firearm.

Anonymous 9–1–1 calls, from individuals who may be motivated by fear or other considerations not to identify themselves, are an important source of information for police officers, who routinely act on such calls to protect the public without awaiting corroboration. Indeed, as this Court has noted, "a call placed and processed via the 9–1–1 system carries enhanced reliability not found in other contexts" because of the criminal penalties for making a false 9–1–1 call. *State v. Golotta,* 178 *N.J.* 205, 218, 837 *A.*2d 359 (2003); *see also United States v. Wooden,* 551 *F.*3d 647, 649–50 (7th Cir.2008) (distinguishing *Florida v. J.L.,* 529 *U.S.* 266, 120 *S.Ct.* 1375, 146 *L.Ed.*2d 254 (2000), from anonymous 9–1–1 calls relating to ongoing emergencies, and noting that 9–1–1 system "designed to provide an emergency response to telephonic tips could not operate if the police had to verify the identity of all callers and test their claim to have seen crimes in progress").[1] Here, the responding officers received a 9–1–1 report that was substantially verified when they arrived at the scene. They had

---

[1] I respectfully disagree with the majority's dismissal of the 9–1–1 caller in this case as an individual "whose identity was questionable and whose information was never corroborated." *Ante* at 136, 47 *A.*3d at 748. While the caller may not have provided his real name—only identifying himself as the victim's brother, "John Smith"—even an anonymous 9–1–1 call is not inherently unreliable as a foundation for police action. *See Golotta, supra,* 178 *N.J.* at 219, 837 *A.*2d 359. It is unclear what, if any, "corroboration" could have occurred in the emergent circumstances of this case.

an objective basis to conclude that immediate action was necessary to protect the victim from violence.

Upon arriving at the residence identified by the 9–1–1 caller, the officers immediately encountered Ms. Richardson. Her behavior gave the officers no reason to dismiss the specter of domestic violence. "Noticeably agitated" when the police officers indicated that they intended to enter her apartment, Ms. Richardson made two representations to them. First, she told them twice that no one was in her apartment except her son. Second, she told the officers that there was "no problem." The officers were in the apartment for only seconds when they realized that the first of these two statements—that the child was alone—was false. They therefore had a reasonable basis to discount her assurances that there was no threat of domestic violence. Ms. Richardson's behavior and statements would heighten a reasonable police officer's concern that he or she confronted a situation that was potentially dangerous to victims and officers alike. As the Court noted in *Wildoner, supra,* 162 *N.J.* at 392–93, 744 *A.*2d 1146, domestic violence victims frequently lie, thereby protecting their abusers. Had the police paused and retreated in the presence of a potential abuser, the danger to Ms. Richardson and her son could have intensified. The police officers' concerns about potential domestic violence could not be assuaged by Ms. Richardson's assurances that there was "no problem" in her home.

It is also significant that officers discovered, moments after their arrival, that there were not one but two potential victims in this case, as Ms. Richardson's young son was in her apartment. In *Bogan,* this Court found the presence of a child in the company of an alleged sexual abuser to be an important factor in its holding that the community-caretaking doctrine justified entry into a home. *Bogan, supra,* 200 *N.J.* at 78–79, 975 *A.*2d 377. Here, the presence of a child, in an apartment that was the subject of a 9–1–1 call alleging domestic abuse by an armed assailant, was no less a cause for reasonable police concern.

What followed was not a comprehensive search of Ms. Richardson's residence, but constrained actions by the police officers.[2]

After frisking defendant and finding no weapon, the officers searched the "immediate area" around the chair upon which he had been sitting, locating the loaded firearm under a pillow on the mattress next to that chair, where it had been within his easy reach. After defendant confirmed that the gun was his—a fact that was disputed by Ms. Richardson, who suggested that it belonged to a former boyfriend—the officers terminated their search, and proceeded no further into the residence. Their actions, in my view, constituted a measured response to a potentially perilous situation.

The majority sets forth a standard for the emergency aid exception to the warrant requirement that departs from the three-part test of *Frankel* in conformance with recent federal jurisprudence. *Ante* at 130–36, 47 *A*.3d at 744–48 (citing *Fisher, supra,* 558 *U.S.* ——, 130 *S.Ct.* 546, 175 *L.Ed.*2d 410; *Brigham City, supra,* 547 *U.S.* 398, 126 *S.Ct.* 1943, 164 *L.Ed.*2d 650). Under that simplified standard, the Court eliminates the second factor of *Frankel,* the officer's " 'primary motivation for entry into the home must be to render assistance, not to find and seize evidence.' " *Id.* at 131, 47 *A*.3d at 745 (quoting *Frankel, supra,* 179 *N.J.* at 600, 847 *A*.2d 561). Instead, the majority establishes a test whereby the State "must prove only that (1) the officers had 'an objectively reasonable basis to believe that an emergency requires that he provide immediate assistance to protect or preserve life, or to prevent serious injury' and (2) there was a 'reasonable nexus between the emergency and the area or places

---

[2] The majority likens the limited search at issue here to the "full-blown search of the house" that was recently held not to be justified by the community-caretaking doctrine in *State v. Kaltner,* 420 *N.J.Super.* 524, 544, 22 *A*.3d 77 (App.Div.2011), *aff'd o.b.,* 210 *N.J.* 114, 41 *A*.3d 736 (2012). The two cases could not be more distinct. In *Kaltner,* the officers fanned out throughout the house, searching every room, after a noise complaint that involved no danger to the residents or the public. *Id.* at 529–32, 22 *A*.3d 77. Here, the officers responded to a report of potential domestic violence involving a firearm with a search of a narrow radius around the chair upon which defendant had been sitting.

to be searched.' " *Id.* at 131, 47 *A.*3d at 745 (quoting *Frankel, supra,* 179 *N.J.* at 600, 847 *A.*2d 561). That test, in my view, is easily met here.

There was an objectively reasonable basis for the officers to believe that there was an emergency: the domestic abuse of a woman by an armed individual, reported by the 9–1–1 caller. There was a reasonable nexus between the emergency and the area that was searched: defendant was sitting within reach of that area when the officers entered the apartment. And as required by the emergency aid doctrine, *id.* at 133–34, 47 *A.*3d at 746–47, the search was constrained to the objectives that prompted the need for immediate action: the protection of a woman and child who were exposed to domestic abuse, according to the 9–1–1 caller.

This case also meets the standard set forth in *Bogan* for the community-caretaking doctrine. The officers' community-caretaking responsibility—the protection of domestic abuse victims in accordance with the Legislature's mandate—was "a real one," not a pretext for a warrantless search. *See Bogan, supra,* 200 *N.J.* at 77, 975 *A.*2d 377. The officers acted in a manner that was objectively reasonable.

The majority is, of course, correct in noting that the State bears the burden of justifying a warrantless search under the emergency aid and community-caretaking exceptions to the warrant requirement, and that any proposed expansion of those exceptions should be approached with caution. *Ante* at 128–29, 47 *A.*3d at 743; *Bogan, supra,* 200 *N.J.* at 72–73, 975 *A.*2d 377. I do not believe that an application of either doctrine to justify the search in this case would represent a change in our existing jurisprudence, which evaluates the conduct of police officers in accordance with a standard of objective reasonableness. Given the Legislature's directive that police officers respond proactively to reports of domestic violence, the recognized propensity of many victims of these crimes to lie, effectively protecting their abusers, and the circumstances encountered by the officers in this case, the officers' conduct was responsible and restrained.

## V.

Our police officers are expected to make split-second decisions, in dangerous settings, that simultaneously preserve our citizens' constitutional rights and protect the public from harm. In this case, the officers responded in an objectively reasonable manner to a report of domestic violence involving a firearm against a woman and a child. In my view, the officers' conduct more than satisfies the requirements of the emergency aid and community-caretaking exceptions to the warrant requirement.

Accordingly, I would reverse the determination of the Appellate Division. I respectfully dissent.

*For affirmance*—Chief Justice RABNER, and Justices LaVECCHIA, ALBIN, HOENS, and Judge WEFING (temporarily assigned)—5.

*For reversal*—Justice PATTERSON—1.