# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4587-16T4

STATE OF NEW JERSEY IN
THE INTEREST OF Z.M., a Juvenile.

_____

Submitted March 8, 2018 – Decided July 12, 2018

Before Judges Haas and Gooden Brown.

On appeal from Superior Court of New Jersey,
Chancery Division, Family Part, Sussex County,
Docket No. FJ-19-0136-17.

Joseph E. Krakora, Public Defender, attorney
for appellant Z.M. (Brian P. Keenan, Assistant
Deputy Public Defender, on the briefs).

Francis A. Koch, Sussex County Prosecutor,
attorney for respondent State of New Jersey
(Shaina Brenner, Assistant Prosecutor, of
counsel and on the Brief).

PER CURIAM

After his motion to suppress evidence seized without a warrant
was denied, juvenile Z.M., born in June 2000, pled guilty to
committing  acts of delinquency which, if committed by an adult,
would constitute second-degree unlawful possession of a handgun,
N.J.S.A. 2C:39-5(b); third-degree unlawful possession of cocaine,
N.J.S.A. 2C:35-10(a)(1); third-degree possession of certain

controlled dangerous substances (CDS) without a prescription, N.J.S.A. 2C:35-10.5(a)(3); possession of under fifty grams of marijuana, a disorderly persons offense, N.J.S.A. 2C:35-10(a)(4); and possession of drug paraphernalia, a disorderly persons offense, N.J.S.A. 2C:36-2. By way of disposition, on June 9, 2017, in accordance with the plea agreement, the Family Part judge placed Z.M. on probation for a period of three years, subject to standard and special conditions of probation.

On appeal, Z.M. raises the following contentions for our consideration:

POINT I

THE MOTION JUDGE ERRED IN DENYING THE JUVENILE'S MOTION TO SUPPRESS BECAUSE NEITHER THE COMMUNITY[-]CARETAKING, NOR THE EMERGENCY[-]AID DOCTRINE APPLY TO THE WARRANTLESS SEARCH OF HIS ROOM.

A. BECAUSE THE JUVENILE WAS IN NO DANGER AFTER MIDNIGHT WHEN HE WAS AT HOME SLEEPING IN HIS BEDROOM, AND THE INFORMATION CONNECTING HIM TO A GUN WAS TENUOUS AT BEST, THE POLICE HAD NO OBJECTIVELY REASONABLE BASIS TO CONCLUDE THAT AN EMERGENCY WAS ONGOING; CONSEQUENTLY, NEITHER THE EMERGENCY[-]AID, NOT THE COMMUNITY[-]CARETAKING DOCTRINES APPLY TO THE WARRANTLESS SEARCH OF HIS ROOM.

B. THE EVIDENCE DISCOVERED IN THE JUVENILE'S ROOM AFTER HE WAS REMOVED MUST BE SUPPRESSED BECAUSE THE POLICE HAD NO OBJECTIVELY

REASONABLE BASIS TO REMAIN IN HIS
ROOM AFTER IT WAS CLEAR THAT THERE
WAS NO EMERGENCY OCCURRING THERE.

After reviewing the record in light of the contentions advanced on appeal, we affirm.

We glean the following facts from the evidence presented by the State at the suppression hearing conducted on May 10 and 15, 2017, during which the State elicited testimony from Patrolman Sean Perry and Sergeant David Dehardt of the Vernon Township Police Department and New Jersey State Troopers Jason Smith, Sean Sullivan, and Shamik Songui. The juvenile's father also testified for the State.

At approximately 11:00 p.m. on January 2, 2017, Z.M.'s father went to Vernon Township police headquarters, expressing concerns about his son's wellbeing. Z.M. had lived with his father in Vernon Township until about July 2016 when he moved in with his mother after his parents divorced. Vernon Township police officers were familiar with Z.M. based on prior reports of truancy, threatening behavior, anger issues and mental health concerns.

Z.M.'s father showed Patrolman Perry and Sergeant Dehardt a photograph on his phone, depicting visible injuries on his son's face. He explained that he had received the photograph from his son at approximately 1:25 a.m. earlier that day during a Facebook messaging exchange, in which Z.M. indicated that the person who

3

assaulted him would "learn his lesson." Z.M.'s father explained further that at approximately 10:30 p.m. that night, he received a photograph from one of his daughters depicting a handgun, a loaded magazine and a large sum of cash with a caption stating "[s]hotty for the body." Z.M. had reportedly posted the photograph on Snapchat and a former neighbor had forwarded the photo to his daughter, who in turn forwarded it to him. Z.M.'s father forwarded both photographs to Patrolman Perry and told the officers he had attempted to contact his ex-wife and his son several times throughout the day without success. Although his other daughter who resided with Z.M. had just texted that Z.M. was home asleep, he was still concerned and agreed that the police should check on his son.

At 11:33 p.m., Sergeant Dehardt contacted the State Police Barracks in the town where Z.M.'s mother resided and spoke to Trooper Smith, relaying the information provided by Z.M.'s father as well as the department's prior experience with Z.M. Although Sergeant Dehardt was unsure whether Z.M. had the gun depicted in the Snapchat posting in his possession, he requested a welfare check on the juvenile to allay his father's concerns.[1] Accompanied by four other troopers who were all briefed on the details, Trooper

_____

[1] The recorded telephone conversation between Dehardt and Smith was played during the hearing.

Smith responded to the juvenile's mother's home, arriving at about midnight. When Z.M.'s mother opened the door, Trooper Smith explained that they were there to conduct a welfare check based on the concerns Z.M.'s father expressed to Vernon Township police officers.[2] Z.M.'s mother, who by all accounts was fully cooperative, invited them into her home and escorted four of the troopers upstairs to Z.M.'s bedroom, while one trooper remained outside to secure the exterior of the home.

Initially, Z.M.'s mother knocked repeatedly on Z.M.'s locked bedroom door. When there was no answer, she retrieved a tool from the kitchen and unlocked the door. As the door opened, all four troopers detected the odor of burnt marijuana and, once inside the bedroom, two of the troopers detected the odor of raw marijuana. When Trooper Smith turned on the bedroom lights, the troopers observed a bong on the floor in the center of the room and Z.M. sleeping on the bed. Troopers Smith and Sullivan noted that Z.M. "had a black eye" and Trooper Songui recalled that Z.M. "was beat up pretty bad[ly]." After some difficulty waking Z.M., Trooper Smith finally awakened him and escorted him to an adjacent living

---

[2] A welfare or well-being check was described as "a call into the station" by "either [a] concerned relative or friend or neighbor," requesting police to check on the well-being of an individual based on a concern that the person may be "sick, not feeling well, depressed, [or] threaten[ed] their own life."

room about twenty feet away. While Troopers Smith and Nugnes remained with Z.M., Troopers Songui and Sullivan secured the bedroom. The troopers testified that given the possible presence of a handgun, they were all concerned about officer safety as well as the safety of the other occupants in the house and the possibility of Z.M. retrieving the weapon.

Upon entering the bedroom, which was described as about ten feet by ten feet, Trooper Songui "traced" the "strong odor of marijuana" to a dresser where the dresser drawer "was cracked open" over two inches. Using his flashlight, he "kind of peaked in" the dresser drawer and observed "a huge bag of weed" inside. Although Trooper Songui testified that he pointed out his discovery to Trooper Sullivan before exiting the room, Trooper Sullivan had no recollection of that.

Trooper Sullivan testified that from where he was standing in the center of the room, about two to three feet away, he observed one of the dresser drawers that was about "waist height" "an inch to two inches" ajar. Inside the drawer, he observed "the muzzle of a handgun . . . stamped Smith & Wesson" laying upside down. Referring to the gun, he immediately announced he "got it." Trooper Smith confirmed he heard Trooper Sullivan yell out that he "found it," and both troopers testified that the discovery was made within thirty seconds to a minute of Trooper Sullivan entering

A-4587-16T4

the bedroom.  When Trooper Sullivan opened the drawer to retrieve the handgun, he observed cash, drug paraphernalia and other drugs in the drawer, which later tested positive for marijuana, cocaine, and Alprazolam.  Thereafter, Z.M. was handcuffed and detained.

At the hearing, Trooper Sullivan testified that the handgun depicted in the Snapchat photo matched the handgun he recovered in Z.M.'s dresser drawer.  He also testified that none of the troopers had their guns drawn during the entire encounter. Further, the troopers testified that at no point did they yell or scream at anyone in the residence or enter any other part of the residence.

Following the hearing, in an oral decision, Judge Michael C. Gaus denied the motion, finding that the search and seizure of the gun, the drugs and the paraphernalia were valid under the emergency-aid, community-caretaking and plain-view exceptions to the warrant requirement, and that Z.M.'s mother provided consent for the troopers to enter the residence and Z.M.'s bedroom. Initially, noting that the troopers' testimony was generally consistent and "[m]any of the facts [were] not in dispute," the judge acknowledged the discrepancy between Trooper Sullivan's and Songui's testimony, regarding Songui pointing out to Sullivan his observation of "a huge bag of weed" in the dresser drawer.

The judge noted

[w]hile that testimony is certainly inconsistent, it does not mean that the troopers don't have any credibility and that they're making up the story in order to cover up . . . an illegal search of the room. As a matter of fact, if they were trying to cover up an illegal search of the room, Trooper Songui, one would think would have done a much better job of coming up with some kind of a story for his actions.

. . . .

So the [c]ourt finds that it is certainly possible for Trooper Sullivan to have been in the room, but to have been looking in another part of the room and not have seen Trooper Songui make that move. . . . [I]t's also possible that Trooper Songui has simply not recalled the incidents of that day correctly.

Next, citing State v. Frankel, 179 N.J. 586 (2004), the judge found that "the actions of the officers were clearly justified" under the emergency-aid doctrine as they were

inside the room . . . for the purpose of rendering aid based upon the reports of the potential injuries that Z.M. had sustained coupled with the mental health issues that had been previously described by Sergeant Dehardt to Trooper Smith and were then . . . conveyed to the other troopers along with the threat of an assault . . . , particularly considering Z.M.'s threat that the person who assaulted him would get what he had coming to him.

The judge also found support under the community-caretaking doctrine as "a separate basis [for the troopers] to gain access to determine that Z.M., in fact, was not in need of further assistance."

The judge rejected the juvenile's reliance on State v. Edmonds, 211 N.J. 117 (2012). In Edmonds, the Court invalidated a warrantless search under either the emergency-aid or community-caretaking exception where the police responded to an "unverified 9-1-1 call" reporting an alleged domestic dispute at a residence, possibly involving a handgun. Id. at 121. Despite the resident's assurance "that there was no problem in her home[,]" the police entered the residence without her consent and found her eleven-year-old son inside "unharmed, without any visible injuries or signs of distress and no indication of a domestic disturbance inside the apartment." Ibid. Nonetheless, the police removed the defendant, who was watching television, from an adjoining room and frisked him, and then proceeded to search the area where the defendant had been seated, finding a handgun underneath a pillow. Ibid.

Judge Gaus found that "there [were] many, many distinguishing facts between [Edmonds] and . . . this case." First, the judge noted that "the original concern was raised by Z.M.'s father," rather than "an unidentified caller." Next, Z.M.'s mother "[c]ooperated fully," "invited the [troopers] inside" the residence, and "consented" to them entering Z.M.'s bedroom. Further, the troopers found Z.M. "injured" and in the condition that "had been described to them," in contrast to Edmonds where

there was no identifiable victim. Additionally, when the troopers entered Z.M.'s bedroom, "they immediately noticed the bong in the center of the room and . . . the strong odor of both burnt and raw marijuana," in contrast to <u>Edmonds</u> where "[t]here was no evidence" of "any other crime." Finally, according to Judge Gaus, in <u>Edmonds</u>, the suspect "had already been detained and frisked before the police undertook a search of the room where he was originally located" and the weapon was ultimately found "in a pillow," rather than in plain view as was the case here.

Turning to the discovery of the gun in the dresser drawer, relying on <u>State v. Gonzales</u>, 227 N.J. 77 (2016), and <u>State v. Padilla</u>, 321 N.J. Super. 96 (App. Div. 1999), Judge Gaus determined that the search was justified under the plain-view doctrine. The judge found that the troopers' "primary motivation . . . was determining whether or not Z.M. was safe and whether or not he required any aid." Further, as in <u>Padilla</u>, the judge was "satisfied that once inside the room, they did not conduct a search." Rather, "they made a visual observation throughout the room in light of the information" conveyed to the troopers going to the scene. The judge found that the troopers "acted reasonably in making visual observations to assure themselves that no weapons were present," and to ensure "that Z.M. could not try to make an unanticipated movement . . . in order to try to get to a weapon."

The judge concluded that the troopers

> were lawfully in the [viewing] area in order to render aid and to fulfill their community[-]caretaking role.
>
> They were not aware of the specific location of any gun. And they clearly did not enter the premises in order to rely upon plain view as . . . a pretext. They could have no way of anticipating that the gun would be out in plain view. . . .
>
> . . . And, obviously a Smith & Wesson handgun being in the partially ajarred drawer [of a] [sixteen]-year old was certainly associated with criminal activity. That gave Trooper Sullivan the authority to open the drawer and that led to the discovery of the other items that were found therein.

The judge entered a memorializing order and this appeal followed.

On appeal, the juvenile argues that "[t]he motion judge erred in determining that the evidence seized . . . was admissible pursuant to the emergency[-]aid and community[-]caretaking exceptions to the warrant requirement" because "[t]here were no exigent circumstances." The juvenile argues further that "[e]ven if the troopers' presence within [Z.M.'s] room was initially appropriate, they exceeded the scope of the exceptions when they remained in the room for an additional ninety seconds looking around until they found the gun." We disagree.

When reviewing a motion to suppress, we "must uphold the factual findings underlying the trial court's decision so long as

those findings are supported by sufficient credible evidence on the record." State v. Rockford, 213 N.J. 424, 440 (2013) (quoting State v. Robinson, 200 N.J. 1, 15 (2009)). "Those findings warrant particular deference when they are 'substantially influenced by [the trial judge's] opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" Ibid. (alteration in original) (quoting Robinson, 200 N.J. at 15). However, "[t]o the extent that the trial court's determination rests upon a legal conclusion, we conduct a de novo, plenary review." Ibid.

"Both the United States Constitution and the New Jersey Constitution guarantee an individual's right to be secure against unreasonable searches or seizures." State v. Minitee, 210 N.J. 307, 318 (2012). Searches and seizures conducted without a warrant, "particularly in a home, are presumptively unreasonable." Edmonds, 211 N.J. at 129 (quoting State v. Bolte, 115 N.J. 579, 585 (1989)). As such, the State has the burden of proving by a preponderance of the evidence that such searches and seizures are "justified by one of the '"well-delineated exceptions" to the warrant requirement.'" State v. Shaw, 213 N.J. 398, 409 (2012) (quoting Frankel, 179 N.J. at 598).

Two such exceptions to the warrant requirement are the emergency-aid and community-caretaking doctrines. State v.

12

Hathaway, 222 N.J. 453, 468-69 (2015); State v. Keaton, 222 N.J. 438, 452 (2015). Under the community-caretaking doctrine, "[c]ourts have allowed warrantless searches . . . when police officers have acted not in their law enforcement or criminal investigatory role, but rather in a community[-]caretaking function." State v. Bogan, 200 N.J. 61, 73 (2009). "In performing these tasks, typically, there is not time to acquire a warrant when emergent circumstances arise and an immediate search is required to preserve life or property." Edmonds, 211 N.J. at 141. Our Supreme Court has held, however, that the community-caretaking doctrine prohibits "the warrantless entry into or search of a home in the absence of some form of exigent circumstances" or "objectively reasonable emergency." State v. Vargas, 213 N.J. 301, 305, 321 (2013).

The Court also made clear that "[p]olice officers serving in a community-caretaking role are empowered to make a warrantless entry into a home under the emergency-aid exception to the warrant requirement." Id. at 323. The emergency-aid doctrine, first enunciated in Frankel, and later modified in Edmonds, "is derived from the commonsense understanding that exigent circumstances may require public safety officials, such as the police, . . . to enter a dwelling without a warrant for the purpose of protecting

13

or preserving life, or preventing serious injury." Hathaway, 222 N.J. at 469 (emphasis omitted) (quoting Frankel, 179 N.J. at 598).

Courts apply a "two-prong test" that considers "the totality of the circumstances" to determine whether the emergency-aid doctrine justifies a warrantless search of a home. Id. at 470, 472. To that end, the State must show that "(1) the officer had an objectively reasonable basis to believe that an emergency require[d] that he provide immediate assistance to protect or preserve life, or to prevent serious injury and (2) there was a reasonable nexus between the emergency and the area or places to be searched." Ibid. (alteration in original) (quoting Edmonds, 211 N.J. at 132). The doctrine does not require "certitude" of danger but only reasonable belief that immediate action is required. Ibid. (quoting Frankel, 179 N.J. at 599). Reasonableness turns on the circumstances at the time and "does not depend on whether it is later determined that the danger actually existed." Ibid.

If an emergency exists, "[t]he emergency-aid doctrine, particularly when applied to the entry of a home, must be 'limited to the reasons and objectives that prompted' the need for immediate action." Edmonds, 211 N.J. at 134 (quoting Frankel, 179 N.J. at 599). "Therefore, police officers looking for an injured person may not extend their search to small compartments such as 'drawers,

cupboards, or wastepaper baskets." Hathaway, 222 N.J. at 470) (quoting Frankel, 179 N.J. at 599). "If, however, contraband is 'observed in plain view by a public safety official who is lawfully on the premises and is not exceeding the scope of the search,' that evidence will be admissible." Ibid. (quoting Frankel, 179 N.J. at 599-600). "When the exigency that justifies immediate action dissipates, the rationale for searching without a warrant is no longer present." Edmonds, 211 N.J. at 134.

Here, we conclude that the troopers had an objectively reasonable basis to believe that immediate assistance was required to protect a life or prevent serious injury, and there was a nexus between the emergency and the area searched. Moreover, the troopers did not impermissibly expand their search to any other part of the residence. Although the troopers had removed the juvenile to an adjoining room when Sullivan observed the gun in plain view, his actions were reasonable for officer safety and the safety of the other occupants in the residence, including Z.M., who, given his mental health issues and threat to retaliate, may have harmed himself or another with the gun. See Gonzales, 227 N.J. at 82 (holding that "[p]rovided . . . a police officer is lawfully in the viewing area and the nature of the evidence is immediately apparent . . . , the evidence may be seized" under the plain-view warrant exception). We are therefore satisfied that

15

the motion judge correctly applied the emergency-aid doctrine to uphold this search and seizure[3] and affirm substantially for the reasons expressed by Judge Gaus in his oral opinion delivered from the bench on May 15, 2017.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[3] In light of our holding, we need not address Judge Gaus' application of the community-caretaking doctrine.

A-4587-16T4