JUSTICE TIMPONE delivered the opinion of the Court.
**200 This case is before us on the narrow issue of the legality of the police's search and seizure of the contents of defendant Lori Hummel's handbag while she was detained at the Gloucester County Prosecutor's Office. We find no valid inventory search. We therefore affirm the Appellate Division's determination that the evidence seized during the search should be suppressed. We remand to permit the defendant to withdraw her guilty plea and continue at the trial court level or, in the alternative, to proceed before a PCR court on other issues she has preserved.
I.
We cull the following facts from the record.
*369 A.
On December 5, 2010, Thomas Carbin was stabbed to death in his apartment in Westville, New Jersey. His lifeless body was found the following morning. The Gloucester County Prosecutor's Office began interviewing individuals to obtain information about Carbin and learned that defendant was in Carbin's "circle of acquaintances."
On December 7, 2010, Woodbury Heights Investigator Gary Krohn observed defendant at a Wawa convenience store located in Woodbury Heights. Defendant knew Investigator Krohn from her prior employment and approached his vehicle to talk. During their conversation, Investigator Krohn discovered that defendant had two outstanding traffic bench warrants. He contacted the Gloucester County Prosecutor's Office to confirm that detectives wanted to speak with defendant. Investigator Krohn thereafter advised defendant that he was going to bring her to the police station for **201 the traffic warrants but assured her that she would be released on her own recognizance.
Investigator Krohn drove defendant and her friend, who had been driving defendant's car without a valid driver's license, to the Gloucester County Prosecutor's Office instead of the court that had issued the warrant. There, Investigator Krohn introduced defendant to Detective Bryn Wilden and Sergeant James Ballenger. Detective Wilden then escorted defendant and her friend into separate interrogation rooms.
Defendant placed her purse on the table in front of her. Around 1:56 p.m., Detective Wilden and Sergeant Ballenger entered defendant's interrogation room to begin questioning her. The detectives took seats at the table without removing defendant's purse or frisking her. Defendant immediately asked the detectives, "What is it about?" Detective Wilden replied that they would "explain that to [her] in just a minute" and began asking defendant about her background. About a minute into questioning, defendant reached into and rummaged through her purse to retrieve her cell phone. She checked the time and advised the detectives that she had to pick up her daughter by 3:20 p.m. The detectives did not comment on her time constraint. Detective Wilden then asked defendant to raise her right hand and swore her in. The detectives began asking defendant substantive questions without advising her of her rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
Detective Wilden asked defendant if she had any idea why they were interested in talking to her, to which she responded, "I have no idea. I thought it was over a taillight, but apparently not, and now I'm scared." Detective Wilden assured defendant that there was no reason to be scared and told her that her name had come up during an investigation. Defendant indicated her apprehension to give the detectives her home address, and Detective Wilden assured her that anything she told them would be kept confidential.
**202 Detective Wilden then asked defendant questions about her whereabouts the day before. In response to questions from the detectives about her cell phone, defendant began to look through her purse for a receipt showing her recent cell phone purchase. After handing Sergeant Ballenger the receipts from her purse, defendant asked, "Can you tell me what's going on here?" Detective Wilden explained that they were investigating someone named "Tom." He assured defendant that she would be able to leave in time to pick up her daughter.
*370 Defendant again expressed concern about giving the detectives certain information. The detectives nonetheless kept questioning her, asking more specifically about her relationship with the victim. Defendant consistently denied being at the victim's apartment on the date of the murder. A little over an hour into the interrogation, Sergeant Ballenger began questioning defendant about the victim's roof, claiming that they had collected footprints. Defendant offered her boots to Sergeant Ballenger for inspection by lifting her feet toward him, allowing him to see the bottom of each boot. The detectives noted that they saw "discoloration" on one boot. Sergeant Ballenger left the room, and defendant took that boot off her foot and handed it to Detective Wilden. With defendant's boot in his possession, Detective Wilden also left the room.
The detectives returned with a consent-to-search form. Defendant stated that they could "absolutely" search her boot and initialed next to each item on the consent form as Detective Wilden read the form to her. The detectives again left defendant alone in the room. She put her belongings back into her purse and stepped outside the door, asking if she could leave because she needed to pick up her daughter. The detectives did not permit her to leave.
She then asked, "Am I arrested?" Detective Wilden responded that "technically" she had traffic warrants. Defendant claimed that the two officers had "jerked [her] around." Detective Wilden told defendant that they still had questions for her. Defendant indicated **203 that she did not want to give any more answers at that time. She stated that she thought she wanted to get a lawyer. After briefly asking questions about defendant's decision to retain a lawyer, the detectives ceased talking to defendant and left the room.
Soon after, Detective Wilden and Sergeant Ballenger asked defendant to sit down in a chair in the corner of the interrogation room. Detective Wilden cuffed defendant's right ankle to a bar on the floor next to the chair and told defendant that she was being detained and that she had an outstanding warrant. Defendant asked several times whether she could make a phone call to her lawyer. Detective Wilden took defendant's purse from the table, and defendant stated that she did not like that he had her pocketbook. Sergeant Ballenger responded that defendant was "in custody." As Detective Wilden began walking out, defendant said, "Hopefully that $500 ain't missing out of there."
In response to defendant's comment, the detectives began taking everything out of her purse and placing each item on the table in the interrogation room. Sergeant Ballenger asked where the $500 was located; defendant responded that it was in her wallet. They asked if she would rather search the purse herself, but defendant declined. While conducting the search, Detective Wilden found two electronic benefits transfer (EBT) cards issued through New Jersey's "Families First" supplemental income program. He asked defendant if the cards were hers. She responded that everything in the pocketbook was hers. Detective Wilden read her the name of another individual on one of the cards. Defendant disavowed that she knew that individual or how the card wound up in her purse. Detective Wilden then put all the items back into the purse and left the room with it.
The detectives left defendant shackled in the interrogation room for over two hours. At one point she asked why she could not get a lawyer, and the detectives failed to allow her to call one. Around 5:48 p.m., the detectives unsecured defendant's ankle *371 and escorted her out of the room to be released. **204 B.
Police arrested defendant three days later, on December 10, 2010. On April 27, 2011, a Gloucester County Grand Jury returned an indictment, charging defendant with first-degree murder, contrary to N.J.S.A. 2C:11-3(a)(1) and (2) ; first-degree felony murder, contrary to N.J.S.A. 2C:11-3(a)(3) ; first-degree robbery, contrary to N.J.S.A. 2C:15-1 ; third-degree possession of a weapon for an unlawful purpose, contrary to N.J.S.A. 2C:39-4(d) ; and fourth-degree possession of a weapon for an unlawful purpose, contrary to N.J.S.A. 2C:39-5(d). On February 15, 2013, an accusation additionally charged defendant with third-degree conspiracy to distribute a controlled dangerous substance (CDS), contrary to N.J.S.A. 2C:35-5(a)(1) and (b)(3). Defendant waived her right to an indictment in exchange for the State amending her first-degree murder charge to first-degree aggravated manslaughter, contrary to N.J.S.A. 2C:11-4(a)(1). The indictment and accusation were then consolidated for disposition.
Defendant moved to suppress her statements to police and the physical evidence obtained during her December 7, 2010 interrogation. After hearing testimony and the parties' arguments and reviewing the video-recorded interrogation, the trial court granted defendant's motion to suppress her statements to police, but denied her motion to suppress physical evidence. Regarding the first motion, the court ruled that the officers conducted a custodial interrogation of defendant without giving defendant her Miranda warnings. The trial court reached this conclusion after considering the totality of the circumstances, which it found demonstrated defendant's reasonable basis to believe that she was not free to leave the prosecutor's office.
Despite its ruling that defendant's statements should be suppressed, the trial court determined that Miranda did not apply to the physical evidence the officers retrieved from defendant. Finding that defendant's action of placing her boots on the table in front of the officers constituted voluntary, non-custodial conduct, the court ruled that the boots did not warrant suppression under **205 the "fruit of the poisonous tree" doctrine. The court likewise denied suppression of the Families First EBT card that did not bear defendant's name because the officers had discovered the card in plain view while conducting a valid inventory search of defendant's purse.
Pursuant to a plea agreement, defendant pleaded guilty to first-degree aggravated manslaughter and third-degree conspiracy to distribute CDS. On March 28, 2013, the trial court sentenced defendant to a twenty-four-year prison term with an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2(a), on the aggravated manslaughter conviction to run concurrently with a four-year prison sentence on defendant's conviction for conspiracy to distribute a CDS.
Defendant appealed from the trial court's denial of her motion to suppress physical evidence. The Appellate Division panel affirmed in part and reversed in part in an unpublished opinion filed on September 14, 2016. The panel affirmed as to the boots but found that the Families First EBT card should have been suppressed because the detectives' inventory search developed into a warrantless investigatory search. The panel ruled that defendant could apply within thirty days to withdraw her guilty plea and to have her conviction vacated and her case listed for trial.
*372 Defendant petitioned for certification, which we denied. 229 N.J. 3 (2017). We granted the State's cross-petition for certification. 229 N.J. 17, 159 A.3d 891 (2017). We also granted the American Civil Liberties Union of New Jersey's (ACLU) motion to participate as amicus curiae.
II.
A.
The State asserts that the detectives sought to remove defendant's purse from the interrogation room to protect their safety, not to search it. The State argues that the detectives conducted a **206 lawful inventory search of the purse after defendant stated that she hoped the $500 in her purse was not missing when they returned to the room with it. Characterizing that statement as a threat, the State urges this Court to balance the officers' intrusion on defendant's Fourth Amendment privacy interests in the purse against the legitimate governmental interest to protect the detectives from defendant's potential false theft claim. The State argues that balancing those competing interests reveals that an immediate inventory search of her purse was "absolutely necessary" in light of defendant's explicit threat to accuse the detectives of theft.
B.
Defendant argues that the inventory-search exception to the Fourth Amendment is "a limited rule of necessity" that is only applicable upon satisfaction of certain conditions. Defendant asserts that the detectives here conducted an unlawful inventory search of her belongings for four reasons: (1) the detectives did not become bailees of her belongings because they never arrested and jailed defendant; (2) there is no evidence suggesting that the detectives followed a standard inventory procedure or created an inventory search list; (3) the detectives did not provide defendant an opportunity to make other arrangements for her property before they began their intrusive search; and (4) the search went beyond that necessary to prevent any false theft claims. Finally, defendant argues that the State's interests in protecting the detectives from false theft claims and safety threats are undermined by the detectives' failures to create an inventory list of defendant's items and frisk her at any point during her detainment.
C.
Amicus curiae the ACLU insists that the detectives conducted an unlawful investigatory search contrary to the Fourth Amendment and urges this Court to uphold our well-established precedent for inventory searches. The ACLU echoes defendant's argument **207 that the narrow inventory-search exception applies only where officers satisfy certain conditions. The ACLU contends that: (1) the detectives did not search defendant's purse as part of a routine pre-incarceration administrative procedure; (2) the State cannot justify an illegal search based upon defendant's conduct after the detectives had already begun that search; and (3) the detectives could have accomplished the goal of avoiding false theft accusations and ensuring safety through less intrusive means.
III.
A.
The Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution protect individuals against "unreasonable searches and seizures." U.S. Const. amend. IV ; N.J. Const. art. I, ¶ 7. This fundamental *373 protection encompasses the privacy rights of our citizenry. Through it, our Court has carefully delineated standards of police conduct that strike a balance between individual privacy expectations and government interests.
While recognizing this balance, our Fourth Amendment opinions have "expresse[d] a clear preference for government officials to obtain a warrant issued by a neutral and detached judicial officer before executing a search." State v. Edmonds, 211 N.J. 117, 129, 47 A.3d 737 (2012). For that reason, "a warrantless search is presumptively invalid." Id. at 130, 47 A.3d 737. The State bears the burden to demonstrate that a warrantless search is reasonable because it fits within a recognized exception to the warrant requirement. State v. Davila, 203 N.J. 97, 111-12, 999 A.2d 1116 (2010) (citing State v. Hill, 115 N.J. 169, 173-74, 557 A.2d 322 (1989) ).
One narrow exception to the Fourth Amendment warrant requirement is the inventory search. See Colorado v. Bertine, 479 U.S. 367, 371, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987) ;
**208 Illinois v. Lafayette, 462 U.S. 640, 643-48, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983) ; State v. Mangold, 82 N.J. 575, 414 A.2d 1312 (1980). An "inventory search is not an independent legal concept but rather an incidental administrative step following arrest and preceding incarceration." Lafayette, 462 U.S. at 644, 103 S.Ct. 2605 (emphasis added). Police may search an arrestee without a warrant and inventory the property in the arrestee's possession before he or she is jailed. Id. at 646, 103 S.Ct. 2605 ; accord State v. Paturzzio, 292 N.J. Super. 542, 550, 679 A.2d 199 (App. Div. 1996). Such searches "serve[ ] a three-fold purpose: protection of the inventoried property while in police custody, shielding the police and storage bailees from false property claims, and safeguarding the police from potential danger." Mangold, 82 N.J. at 581-82, 414 A.2d 1312 (citing South Dakota v. Opperman, 428 U.S. 364, 369, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) ).
That an inventory search is administrative in nature does not relieve it from Fourth Amendment strictures. See id. at 583, 414 A.2d 1312. An inventory search is still a search and must be reasonable under the circumstances to pass constitutional muster. See id. at 584, 414 A.2d 1312. In Mangold, we explained that the propriety of an inventory search involves a two-step inquiry: (1) whether the impoundment of the property is justified; and (2) whether the inventory procedure was legal. Id. at 583, 414 A.2d 1312. For there to be a lawful inventory search, there must be a lawful impoundment. Ibid. ("The threshold consideration is of fundamental importance as it is the act of impoundment which generates the necessity for the inventory."). Courts need only analyze the reasonableness of the inventory search if the impoundment is justified.
Several factors are relevant to the reasonableness inquiry. They include "the scope of the search, the procedure used, and the availability of less intrusive alternatives." Id. at 584, 414 A.2d 1312. While no factor alone is dispositive, a balancing of each against the others ensures that "[t]he inventory search procedure [is] no more intrusive than reasonably necessary to respond to the **209 protective functions which fostered its creation." Id. at 587, 414 A.2d 1312.
B.
Applying those principles to the present case, we hold that the detectives conducted an invalid inventory search contrary to the Fourth Amendment and Article I, Paragraph 7 of the New Jersey Constitution.
*374 Under the first Mangold inquiry, we conclude that the detectives' impoundment of defendant's purse was not justified. 82 N.J. at 583, 414 A.2d 1312. The State argues that the detectives sought to remove defendant's purse from the interrogation room due to safety concerns. Although we recognize that safety concerns may warrant the impoundment of property in some cases, those concerns did not justify the impoundment here.
The detectives had not arrested defendant before seeking to impound her purse. Defendant kept her purse open and within her reach for the entire interrogation. During questioning, she rummaged through her bag several times in front of the detectives. The detectives did not frisk defendant at any point during her detention. They sought to remove her bag from the interrogation room only after she asked for an attorney. Crucially, at the beginning of their search, they asked defendant if she would rather examine the contents of her purse herself. It is clear that had valid safety concerns existed at the time they sought to impound her bag, the officers would not have given defendant the option to search her own purse. We therefore reject any contention that safety concerns justified the detectives' removal of her bag from the interrogation room.
Because we find that the impoundment of defendant's purse was not justified, the inventory search exception does not apply to the detectives' search. See ibid. However, even if the initial impoundment was justified under the first Mangold inquiry, **210 the search would fail under the balancing test required by the second.
The State asserts that the detectives inventoried the items in defendant's purse to protect themselves against defendant's immediate and explicit theft threat. Their search, however, cannot withstand the balancing test we articulated in Mangold. Under that test, we consider factors like "the scope of the search, the procedure used, and the availability of less intrusive alternatives." Id. at 584, 414 A.2d 1312.
Here, the detectives initiated the search to find the $500 defendant claimed her purse contained. The scope of the search should have been limited to that $500. Detective Wilden instead broadened his search to include an inspection of the details on cards found inside. As this clearly exceeded the search's scope, that first factor weighs in defendant's favor.
With respect to the second factor, whether law enforcement conducted the search pursuant to routine police procedures is essential. Law enforcement may not use inventory searches as "a ruse for a general rummaging in order to discover incriminating evidence." Florida v. Wells, 495 U.S. 1, 4, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990). Standardized procedures prevent the searching officer from having "so much latitude that inventory searches are turned into 'a purposeful and general means of discovering evidence of crime.' " Ibid. (quoting Bertine, 479 U.S. at 376, 107 S.Ct. 738 (Blackmun, J., concurring) ). Searches conducted at variance with or in the absence of standardized practices are unlikely to satisfy the inventory-search warrant exception.
The State concedes that the departmental policy for inventory searches pertaining to Detective Wilden and Sergeant Ballenger is unknown. There is no way then for this Court to determine whether the detectives' search was executed according to any purported administrative policy or practice. Indeed, the State acknowledges that the detectives had to "improvise" in light of defendant's perceived theft threat. If anything, that concession **211 suggests to the Court that the detectives did not act in accordance with a standard inventory search procedure. *375 Finally, we find that the detectives had reasonable, less intrusive alternatives available to protect them against false theft claims that would have simultaneously respected defendant's constitutionally protected privacy rights. They could have, for example, placed defendant's purse directly into a sealed evidence bag or asked defendant to make arrangements for someone to retrieve the bag from the prosecutor's office.
Because the balance tips very heavily in favor of defendant's constitutionally protected privacy interests, we cannot find that the handbag search here was conducted "with the intent to foster the protective functions it was designed to promote." Mangold, 82 N.J. at 584, 414 A.2d 1312. Our conclusion is further supported by the detectives' decision to continue interrogating defendant about items they found inside her purse other than the $500 she claimed was in the bag. We find that the inventory search exception to the Fourth Amendment warrant requirement does not apply and that the detectives' search was unconstitutional. See State v. Badessa, 185 N.J. 303, 311, 885 A.2d 430 (2005) (explaining that "the State is barred from introduction into evidence the 'fruits of an unlawful search or seizure by the police' "). We therefore affirm the appellate panel's determination that the evidence seized through the search should have been suppressed.[1] See id. at 577-80, 414 A.2d 1312.
**212 The State concedes that the detectives did not conduct a "traditional" inventory search. Our review of the record reveals that nearly every aspect of the purported inventory search was not "traditional." They did not formally arrest her that day, but rather let her leave and arrested her three days later.
IV.
We affirm the judgment of the Appellate Division and remand to permit defendant to raise issues she has preserved before a PCR court, or withdraw her guilty plea and continue before the trial court.
CHIEF JUSTICE RABNER and JUSTICES PATTERSON, FERNANDEZ-VINA, and SOLOMON join in JUSTICE TIMPONE's opinion. JUSTICE LaVECCHIA filed a separate, partially concurring and partially dissenting opinion, in which JUSTICE ALBIN joins.
JUSTICE LaVECCHIA, concurring in part, dissenting in part.
I concur in the judgment affirming the suppression of the evidence seized during the search of defendant's handbag. We granted the State's cross-petition for certification to determine the legality of the inventory search. We erred, however, in denying defendant's petition.
In her petition, defendant argued that the failure to honor her Miranda [1] rights tainted all the police conduct that followed the police taking her into custody. Underlying the petition, moreover, was whether the police unlawfully detained defendant.
*376 If she is right, plain error permeates her interrogation and the fruits of that poisoned investigation. Yet, by taking only the State's petition and addressing only the State's claimed error in the suppression of its alleged inventory search, we have fomented piecemeal **213 review of defendant's claims. The Court's failure to reach those issues at this time disserves the interest of justice.
Arguments and issues are being reviewed in isolation when instead they should be considered in tandem because they affect one another. Issues concerning search and seizure are generally assessed using a totality of the circumstances approach, looking at the entire picture of the case, and not engaging in a piecemeal analysis. See, e.g., State v. Randolph, 228 N.J. 566, 587, 159 A.3d 394 (2017) ; State v. Rosario, 229 N.J. 263, 275, 162 A.3d 249 (2017) ; State v. Johnson, 171 N.J. 192, 214-17, 793 A.2d 619 (2002).
In the petition that we did not take, defendant claimed that her entire questioning was coercive and fundamentally unfair in numerous respects, all exacerbated by the lack of warnings. No one contests that defendant should have been warned of her Miranda rights because she was in a custodial interrogation. The trial court held as much, and the Appellate Division affirmed. Both courts relied on the lack of warnings to suppress defendant's verbal responses to questioning. However, because we did not take defendant's petition, defendant has been deprived of our review of the claimed coercive impact of the lack of warnings and custodial interrogation on all other evidence the State secured from her during the unusual circumstances surrounding her detention. The remand will not correct the mistake.
The majority's analysis ignores the elephant in the room: There is absolutely no reason to analyze whether this was a lawfully conducted inventory search if defendant was unfairly questioned in a custodial interrogation and unlawfully detained. A lawful detention is a condition precedent for a lawful inventory search. Illinois v. Lafayette, 462 U.S. 640, 643, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983) ("It is the fact of the lawful arrest which establishes the authority to search."); see also State v. Padilla, 321 N.J. Super. 96, 111, 728 A.2d 279 (App. Div. 1999), aff'd o.b., 163 N.J. 3, 746 A.2d 452 (2000).
I understand that trial counsel did not use the proper incantation-did not use words declaring a "challenge" to defendant's **214 detention. See ante at 211 n.1, 179 A.3d at 375 n.1. But, the challenge was present nonetheless. The thrust of defendant's appeal was an attack on the voluntariness of her presence at the prosecutor's office.[2] Defendant contends there were multiple misleading and coercive steps taken against her, including that she was told she was being brought to police headquarters to be released on her own *377 recognizance on traffic warrants when instead she was transported to the prosecutor's office as a person of interest in a homicide investigation. She alleges she was subjected to misinformation and duplicity during an interrogation while uncounseled in her rights. (It bears repeating that no one disputes that her Miranda rights were violated, as found by the trial court and the Appellate Division.) The officers also promised her confidentiality, which our appellate courts and sister states have held to be antithetical to the privilege against self-incrimination. See, e.g., Hopkins v. Cockrell, 325 F.3d 579, 584 (5th Cir. 2003) ; Leger v. Commonwealth, 400 S.W.3d 745 (Ky. 2013) ; State v. Fletcher, 380 N.J. Super. 80, 82, 880 A.2d 1171 (App. Div. 2005). Thus, she challenged directly the "consensual" nature of her interrogation by investigators, who refused to let her leave or receive phone calls, and who eventually chained her to a bar on the floor.
Based on the Appellate Division's opinion one can view the lack-of-Miranda-warnings argument by defendant as resolved. Rule **215 3:22-5 expressly bars post-conviction relief if "a prior adjudication upon the merits of any ground for relief is conclusive." When this Court decided not to take defendant's petition, we left defendant with two options: Being forced to try to convince a trial court or a PCR court that her arguments were not fully resolved on appeal and attempt to secure from the court a fresh look at those arguments, or being relegated to a claim that her trial attorney's failure to challenge her detention amounted to ineffective assistance of counsel.
Defendant's arguments deserved review along with the State's arguments on direct appeal. That contextual review mattered here. Defendant's appellate counsel tried valiantly to place in context the essential questions in this matter. She did so without breaching professional protocols, even while including a forthright footnote in her Appellate Division brief, noted again to us in oral argument, preserving for a potential ineffective assistance of counsel claim the trial counsel's failure to utter the right words: I challenge the constitutionality of defendant's detention.
We can recognize plain error when it stares us in the face. The issue of the lawfulness of defendant's detention permeated the issues defendant raised in argument before the Appellate Division and incorporated in her petition to this Court. We should not be sending this matter back for procedural permutations that will result in wasting judicial resources, time, and money.
By not hearing now defendant's arguments about the lack-of-warnings' impact on her entire interaction with the investigators, we missed addressing the prerequisite question to an inventory-search analysis. We should have allowed that to come to the fore, rather than waste time answering a back-end question that may well be unnecessary. After hearing the oral argument in this matter, we should have re-considered our denial of defendant's petition for certification and indulgently viewed her multi-faceted argument that improper police procedures rendered all of her statements and all evidence obtained during her custodial interrogation fruits of the poisonous tree. See **216 Wong Sun v. United States, 371 U.S. 471, 485, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) ; State v. Lee, 190 N.J. 270, 277-78, 920 A.2d 80 (2007) ("Pursuant to the exclusionary rule, the State may not introduce evidence obtained from an unlawful search or seizure by the police."). If further briefing and additional argument was a collateral consequence, or if a remand for further fact-finding were necessary, none of that would have been extraordinary for this Court. See, e.g., State v. Dunbar, 229 N.J. 521, 525, 163 A.3d 875 (2017) ; State v. Moore, 180 N.J. 459, 460, 852 A.2d 1073 (2004) ("And this *378 Court having determined on prior occasions that when resolution of a critical issue depends on a full and complete record the Court should await, before decision, the development of such a record."). In the long run, it would have been more efficient than the road that now lies ahead in this criminal matter.
We could have and should have put this case swiftly on track, and that failure, for me, necessitates this separate dissent.

Defendant argues that her trial counsel did not challenge the constitutionality of her detention before the trial court. She asserts, therefore, that the nature of defendant's traffic warrant is not clear from the record, and the trial court did not address whether the detectives lawfully detained defendant at the Gloucester County Prosecutor's Office. We acknowledge that the legality of defendant's detention has not yet been briefed or argued before this or any other court. At this time, we defer any comment other than to recognize that defendant has preserved this issue for a possible later challenge-either before a PCR court or, should defendant withdraw her guilty plea, before the trial court during further proceedings in this case.

Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The trial court's clear and compelling findings indicate that defendant was detained and suggest that the detention was unlawful:
Here, in considering the totality of the circumstances, it appears to this Court that defendant did not believe she was free to leave. Defendant was confronted with active warrants at the Wawa convenience store and transported by law enforcement officers to the Prosecutor's Office. Even if she was not arrested, she knew that the police had a basis to have her arrested based on those warrants. Defendant agreed to accompany the police upon being notified that they would release her on her own recognizance if she agreed to come in and speak to the Prosecutor's Office. That inherent compulsion leads this Court to find that she was not "invited" and did not consent to going to police headquarters .... [She] had to leave her car behind .... Clearly, if defendant wanted to leave, she would have had to ask the police for a ride back or walk at least a mile.