SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**State v. O.D.A.-C.** (A-78-20) (085608)

**Argued February 28, 2022 -- Decided May 2, 2022**

**RABNER, C.J., writing for a unanimous Court.**

In this appeal, the Court considers whether the State carried its burden of proving beyond a reasonable doubt that defendant O.D.A.-C. voluntarily waived his Miranda rights and that his statement to police is thus admissible -- even though a detective repeatedly undermined the Miranda warnings throughout an interrogation.

Beginning in late September 2013, a detective from the Bergen County Prosecutor's Office (BCPO) and a detective from the Hackensack Police Department investigated an allegation that defendant had inappropriately touched H.B., then fourteen years old, on ten to fifteen occasions over a two-year period.

The detectives interviewed defendant for approximately thirty-five minutes. At the outset, the Hackensack detective said, "Just a formality. . . . I just have to read you your rights, okay?" (emphasis added). After that comment, the Hackensack detective read the Miranda warnings aloud from a form; defendant initialed each right; both the detective and defendant read aloud a paragraph titled "waiver of rights"; and defendant signed under the waiver paragraph.

The detectives then told defendant about H.B.'s allegations and made it clear that they believed her. They attempted to get defendant to confirm the allegations and asked, among other things, how many times he had touched H.B.

Defendant was hesitant to respond. When asked if he had touched H.B. "8 to 15 times," he said, "It's too many." When asked if it happened 15 or 20 times, he responded, "I don't think so." The Hackensack detective then encouraged defendant to respond more fully, telling him things like "you're gonna feel so much better about yourself once you do get it out," and "[w]hat we talk about in here is between us." "[I]t's confidential between us, it's staying between us, okay."

As the detectives continued to ask defendant how many times he had touched H.B., defendant eventually said, "Well, first of all, when you make me write that, it say that anything that I say, it goes against my, you know." The Hackensack

1

defendant then repeated, "That's a formality, that's what it is." Defendant stated, "[I]t's gonna work against me," but the Hackensack detective advised, "[W]hatever you're saying here, it may be hard to believe that it's not going to work against you, your cooperation is paramount."

After defendant again expressed his reservations, the Hackensack detective added, "Anything you say, like I said, is only going to help you, it's not going to hurt you." Shortly thereafter, defendant said, "If I could have had a lawyer here present then it would be a different story," and the detectives ended the interview.

Defendant was indicted and moved to suppress his statement pretrial. After a hearing, the court found that defendant's rights were not violated because he had knowingly, intelligently, and voluntarily waived his rights.

A divided Appellate Division panel suppressed the statement. The majority concluded the Hackensack detective's comments amounted to a "blatant end-run around measures designed to protect bedrock constitutional guarantees." The dissent agreed the Hackensack detective's comments were improper but found they did not undermine the clear <u>Miranda</u> warnings defendant had been given or his knowing, intelligent, and voluntary waiver of those rights. The State appealed as of right, based on the dissent. <u>See</u> <u>R.</u> 2:2-1(a)(2).

**HELD:** Because a detective here repeatedly contradicted and minimized the significance of the <u>Miranda</u> warnings -- starting at the outset of the interrogation and continuing throughout -- the State cannot shoulder its heavy burden of proving defendant's waiver was voluntary. The Appellate Division majority correctly concluded defendant's statement had to be suppressed.

1. Before the police can interrogate a suspect in custody, they must inform the person of his constitutional rights in accordance with <u>Miranda</u>. And in New Jersey, the State must also prove beyond a reasonable doubt that the individual knowingly, intelligently, and voluntarily waived those rights in light of all the circumstances. That burden of proof is higher than under federal law. Under the totality-of-the-circumstances test, courts commonly consider a number of factors to determine if a <u>Miranda</u> waiver is valid. Beyond the issue of waiver, there are separate due process concerns related to the voluntariness of a confession. The totality-of-the-circumstances test applies here as well, and there is a substantial overlap with the factors that apply to a waiver analysis. (pp. 15-16)

2. Courts have long recognized that "[a] police officer cannot directly contradict, out of one side of his mouth, the <u>Miranda</u> warnings just given out of the other." <u>State v. L.H.</u>, 239 N.J. 22, 44 (2019). Certain remarks by the Hackensack detective are problematic under that simple standard. Referring to <u>Miranda</u> warnings as a

2

"formality," for example, downplays their significance. <u>Miranda</u> warnings are a constitutional requirement meant to protect a person's rights under the Fifth Amendment; they are not a formality. Suggesting or promising that an interrogation will remain confidential is even more troubling because it directly contradicts one of <u>Miranda</u>'s core warnings: that anything said "can be used against [a person] in a court of law." <u>Miranda v. Arizona</u>, 384 U.S. 436, 479 (1966). To suggest that statements "will not work against" or "be used against" a suspect raises similar concerns. Such comments are also at odds with <u>Miranda</u>'s warning that a suspect's statements can be used against the person. Finally, telling suspects that confessing "could not hurt" and "could only help" them also contradicts <u>Miranda</u>. (pp. 16-18)

3. In this appeal, a detective undermined the <u>Miranda</u> warnings in all of the above ways to try to elicit a confession. The Court disapproves of each of the detective's misleading comments but declines to adopt a bright-line rule that would require suppression any time an officer makes an improper comment during an interrogation. Such an approach would lead to the suppression of voluntary statements in a number of instances. In contrast, the totality-of-the-circumstances test can both root out improper police statements that result in an invalid waiver and recognize knowing and voluntary waivers. (pp. 18-19)

4. Here, the Hackensack detective not only undermined the warnings immediately before he recited them, but he also contradicted them at various points throughout the interrogation. And even though the BCPO detective partly restated the warnings at one point, none of the Hackensack detective's misstatements were expressly corrected during the interrogation. Although not all circumstances present in this case suggest that defendant's waiver was not voluntary, the Court finds it impossible to isolate and minimize the string of misrepresentations here. Cumulatively, the number and significance of the detective's misleading statements undermined the <u>Miranda</u> warnings and, by extension, the voluntariness of defendant's waiver. Stressing that defendant's interrogation began with a misleading remark that was reinforced by yet more misrepresentations throughout the questioning, the Court finds the statement must be suppressed in full. In doing so, the Court gives deference to the trial court's factual findings but observes that it is not bound by the trial court's determination of the validity of the waiver, which is a legal, not a factual, question. Because the Court finds defendant's waiver was not knowing and voluntary under the circumstances, it does not consider the voluntariness of the statement on due process grounds. (pp. 19-22)

    **AFFIRMED.**

**JUSTICES ALBIN, PATTERSON, SOLOMON, and PIERRE-LOUIS and JUDGE FUENTES (temporarily assigned) join in CHIEF JUSTICE RABNER's opinion.**

3

State of New Jersey,

Plaintiff-Appellant,

v.

O.D.A.-C.,

Defendant-Respondent.

On appeal from the Superior Court,
Appellate Division.

| Argued | Decided |
| --- | --- |
| February 28, 2022 | May 2, 2022 |

Edward F. Ray, Assistant Prosecutor, argued the cause
for appellant (Mark Musella, Bergen County Prosecutor,
attorney; Edward F. Ray, of counsel and on the briefs,
and John J. Scaliti, Legal Assistant, on the briefs).

John Vincent Saykanic argued the cause for respondent
(John Vincent Saykanic, on the brief).

Catlin A. Davis, Deputy Attorney General, argued the
cause for amicus curiae Attorney General of New Jersey
(Matthew J. Platkin, Acting Attorney General, attorney;
Catlin A. Davis, of counsel and on the brief).

Joseph J. Russo, Deputy Public Defender, argued the
cause for amicus curiae Public Defender of New Jersey
(Joseph E. Krakora, Public Defender, attorney; Joseph J.

Russo, and Alison Perrone, First Assistant Deputy Public Defender, of counsel and on the brief).

Alan Silber argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey (Pashman Stein, attorneys; CJ Griffin and Joshua P. Law, on the brief).

Lauren Gottesman, of the New York bar, admitted pro hac vice, argued the cause for amicus curiae Innocence Project (Innocence Project and Dechert, attorneys; Paul Kingsbery, J. Ian Downes, Lauren Gottesman, David Weinraub, of the New York and Maine bars, admitted pro hac vice, Arif Hyder Ali, of the New York and District of Columbia bars, admitted pro hac vice, and Rose Marie Wong, of the Pennsylvania bar, admitted pro hac vice, on the brief).

CHIEF JUSTICE RABNER delivered the opinion of the Court.

Law enforcement officers must convey certain important warnings to individuals before they can be interrogated while in custody. Among other familiar principles, suspects must be told they have the right to remain silent and that anything they say can and will be used against them. See Miranda v. Arizona, 384 U.S. 436, 479 (1966).

In this appeal, a detective administered Miranda warnings but repeatedly undermined them throughout an interrogation. To encourage defendant to confess, the detective, for example, said the warnings were "[j]ust a formality"

2

and that anything discussed would remain "confidential between us." Just the opposite is true, however.

A defendant's statement to the police, made in custody, is admissible if it is given freely and voluntarily, after the defendant received <u>Miranda</u> warnings, and after he knowingly, voluntarily, and intelligently waived his rights. The State must prove beyond a reasonable doubt that a defendant's waiver was valid. <u>State v. Sims</u>, ___ N.J. ___, ___ (2022) (slip op. at 24). Courts look to the totality of the circumstances to assess whether the State has met its burden. <u>Ibid.</u>

Because a detective here repeatedly contradicted and minimized the significance of the <u>Miranda</u> warnings -- starting at the outset of the interrogation and continuing throughout -- the State cannot shoulder its heavy burden. We therefore affirm the judgment of the Appellate Division majority, which concluded defendant's statement had to be suppressed.

I.

A.

We draw the following facts from two sources: an investigative report prepared by a detective assigned to the Bergen County Prosecutor's Office (BCPO); and questions posed by the same detective, as well as a detective

3

assigned to the Hackensack Police Department, when they interviewed defendant.

Beginning in late September 2013, the detectives investigated an allegation that H.B.,[1] then fourteen years old, had been sexually assaulted. H.B.'s mother learned of the assault when she read a text message on H.B.'s cell phone; H.B. reportedly told a friend that she had been "raped." When confronted about the text, H.B. disclosed that her grandmother's boyfriend -- defendant O.D.A.-C. -- had touched her inappropriately.

In an interview with the detectives soon after, H.B. told them that defendant had touched her in a sexual manner on ten to fifteen occasions from when she was about eleven to thirteen years old. H.B. relayed that defendant touched her breasts and vagina with his hands and mouth.

Defendant voluntarily admitted himself to the hospital in September 2013 for psychological treatment. When he was discharged about ten days later, on October 2, 2013, law enforcement officers drove him from the hospital to the police station to be interviewed.[2]

---

[1] We use initials to protect the identity of the victim. See R. 1:38-3(c)(12).

[2] According to the police, defendant agreed to accompany them to the station. Defendant claims he did not go to the police station willingly and was handcuffed on the way there. The trial court credited the officers' testimony at the suppression hearing, and we defer to its factual findings. State v. Tillery,

The detectives from the BCPO and the Hackensack Police Department interviewed defendant for approximately thirty-five minutes. We quote at length from the transcript of the videotaped interview because it is central to this appeal.

The following exchange took place at the outset:

> BCPO Det.: He's gonna go through some information and some questions he has to ask you first before we can talk to you, all right?
>
> Defendant: Um-hmm.
>
> Hackensack Det.: <u>Just a formality</u>. [Defendant's first name], I just have to read you your rights, okay? Just tell me if you understand them, if you don't, I'll explain them to you.
>
> [(emphasis added).]

After that comment, the Hackensack detective read the <u>Miranda</u> warnings aloud from a form; defendant initialed each right; both the detective and defendant read aloud a paragraph titled "waiver of rights"; and defendant signed under the waiver paragraph.

The detectives then told defendant about H.B.'s allegations and made it clear that they believed her. For about fifteen minutes, they recounted H.B.'s

---

238 N.J. 293, 314 (2019). In any event, the State does not challenge that defendant was in custody when he arrived at the police station.

statement and explained they had reached a point in their investigation when it was time to confront defendant and "see what [he] had to say." The detectives next attempted to get defendant to confirm the allegations and asked, among other things, how many times he had touched H.B.

Defendant was hesitant to respond. When asked if he had touched H.B. "8 to 15 times," he said, "[i]t's too many." When asked if it happened 15 or 20 times, he responded, "I don't think so." The detectives then encouraged defendant to respond more fully:

> BCPO Det.: It happened once or twice, is it more likely that's what happened? Is that number too big? [Defendant's first name], be truthful with me, I know -- I could see it in your face, you wanna get it out in front of us --
>
> Hackensack Det.: And you're gonna feel so much better about yourself once you do get it out.
>
> Defendant: If you turn that off and then I --
>
> Hackensack Det.: I can't turn that off, okay.
>
> Defendant: And this --
>
> BCPO Det.: And this room is being recorded also. I can't --
>
> Defendant: I know but that's I got -- [inaudible] --
>
> BCPO Det.: That's a law, that's to protect you.

6

Hackensack Det.: <u>What we talk about in here is between us</u>, that's why I brought you in this room, I didn't wanna speak about it in front of the secretary and in front of the other people in there. We have civilians walking into that room, that wouldn't be fair to you or us having people coming in there listening to what we're talking about. We're in here, <u>it's confidential between us, it's staying between us, okay</u>.

[(emphases added).]

Immediately after that exchange, defendant admitted he had used steroids and agreed with the Hackensack detective that, when you inject yourself, "[y]ou do silly things."

The detectives then continued to question defendant about how many times he had inappropriately touched H.B., which led defendant to refer back to his <u>Miranda</u> rights:

BCPO Det.: Well, how many times do you think this happened? Really? Is it more than 15?

Defendant: I don't know what to tell you guys. I mean, you put it -- it's like --

Hackensack Det.: You gotta just tell the truth. We don't wanna put words in your mouth.

BCPO Det.: Well I'm not saying -- listen, I'm not saying -- it's not a hundred, right? This didn't happen a hundred times? You didn't touch this girl a hundred times? Right?

Hackensack Det.: And she's not even saying that.

7

Defendant:  Hundred times.  Not 15.

BCPO Det.:  Okay, not 15.

Defendant:  Not ten.

BCPO Det.:  So is it -- not ten?  So you think it was less than 10?  You know, kids don't know numbers that well, you know, this is a hard thing for her, she's only a little girl and, and you know to have this thing happen to her and then for me to ask her how many times, she doesn't know.  So she was taking a guess at 15 -- between 8 and 15.  That's the number she gave me, but I want to hear it from you.  Is it something that happened more than once?

Defendant:  I don't know what to tell you.

BCPO Det.:  Well, that's not a hard question.  We're already at the point it happened, right?  We're just at the point of how many times.

Defendant:  Well, first of all, <u>when you make me write that, it say that anything that I say, it goes against my, you know</u>.

BCPO Det.:  That's your --

Hackensack Det.:  <u>That's a formality, that's what it is</u>.

Defendant:  [Inaudible] -- it's gonna work against me. So if I tell you yes, I did it or no I didn't, it's not, so, you know.

[(emphases added).]

8

After that exchange, the BCPO detective reiterated, "those are your rights and that's -- you are a hundred percent right, you have the right to not tell us anything you want."

The detectives then resumed asking about the number of incidents. When asked if the assaults occurred "maybe five times," defendant said, "[m]aybe a couple times, maybe not." The Hackensack detective then advised, "whatever you're saying here, it may be hard to believe that <u>it's not going to work against you</u>, your cooperation is paramount." (emphasis added).

Minutes later, defendant again expressed his reservations:

> I mean, these are things that, you know, tell you the truth, I don't feel comfortable right now and I, you know, you ask me, I know you say you want to help me and all that, but, I, I mean, this is no, like, for me it's not my first case. So, I -- I went to -- you know, already was -- I was incarcerated for a mistake too that I did and they told me the same thing, they said, you know, talk, talk, talk, talk and then, you know, I help the guys or whatever it is . . . .

In response, the Hackensack detective acknowledged that defendant had sought help voluntarily. The detective added, "You're basically at the point where you want to tell us what happened to get this off your chest. Okay. <u>Anything you say, like I said, is only going to help you, it's not going to hurt you</u>. You understand what I'm saying?" (emphasis added).

9

Shortly thereafter, defendant said, "[i]f I could have had a lawyer here present then it would be a different story," and the detectives ended the interview.

B.

On December 23, 2014, a Bergen County grand jury returned a twelve-count indictment that charged defendant with first-degree aggravated sexual assault; second-degree sexual assault; third-degree aggravated criminal sexual contact; and second-degree endangering the welfare of a child.

Defendant moved to suppress his statement pretrial. After a hearing at which the BCPO detective, another officer, and defendant testified, the trial court denied the motion. The court found the officers credible and concluded that defendant's rights were not violated. Despite the Hackensack detective's comment that the <u>Miranda</u> warnings were "just a formality," the court found that defendant knowingly, intelligently, and voluntarily waived his rights.[3]

On September 12, 2018, defendant pleaded guilty to second-degree endangering the welfare of a child. Under a conditional plea agreement, he preserved the right to challenge the admission of his statement on appeal.

---

[3] We do not consider the trial court or the Appellate Division's rulings on whether defendant was involuntarily taken to the police station because the issue is not part of this appeal.

10

Consistent with the plea agreement, the court later sentenced defendant to a three-year suspended prison sentence and parole supervision for life.

A divided Appellate Division panel suppressed the statement. The majority concluded the Hackensack detective's comments amounted to a "blatant end-run around measures designed to protect bedrock constitutional guarantees." The majority observed the statements "undermined the warning from the start and . . . misrepresent[ed] their effect"; "drew admissions . . . from an otherwise-reticent defendant"; and "call[ed] into question defendant's true understanding of his rights." As a result, the majority found the State had failed to demonstrate defendant's waiver was voluntary. In addition, "[b]ecause the Hackensack detective built upon the initial misrepresentation that the Miranda warnings were just a formality," the court struck the entire statement. It therefore vacated defendant's conditional plea and remanded the case to the trial court.

The dissent agreed the Hackensack detective's comments were improper but found they did not undermine the clear Miranda warnings defendant had been given or his knowing, intelligent, and voluntary waiver of those rights. The dissent noted the trial judge had reviewed the recorded interview and heard live testimony before concluding defendant was not confused or misled by references to formality or confidentiality. According to the dissent,

11

defendant's conduct during the interview supported that finding. He knew the interview was being recorded, understood that confessing would "work against" him, and invoked his right to counsel after thirty-five minutes. For those reasons among others, the dissent would have affirmed the trial court's judgment.

The State appealed as of right, based on the dissent. See R. 2:2-1(a)(2). We granted leave to appear as amici curiae to the Attorney General, the Public Defender, the Innocence Project, and the Association of Criminal Defense Lawyers of New Jersey (ACDL).

## II.

The State argues that the Appellate Division erred when it suppressed defendant's statement. The State concedes the Hackensack detective offered inappropriate assurances about confidentiality and made improper comments that the Miranda warnings were a "formality." Nonetheless, the State maintains the comments, considered in context, "did not undermine defendant's understanding or appreciation of his Miranda rights." In the alternative, the State submits it was error to suppress the entire statement.

The Attorney General echoes those arguments and contends the trial court's ruling is supported by the totality of the circumstances.

12

Defendant contends the Hackensack detective's comments disarmed and deceived him and vitiated his <u>Miranda</u> rights. As a result, defendant argues he could not have knowingly, intelligently, and voluntarily waived his rights. Defendant therefore urges the Court to affirm the Appellate Division and suppress the entire statement.

The arguments of the Public Defender, the Innocence Project, and the ACDL align with defendant's position. In addition, the Public Defender asks the Court to announce a bright-line rule that "when the police contradict or minimize <u>Miranda</u> warnings, any subsequent <u>Miranda</u> waiver cannot be knowing or voluntary." The Innocence Project submits that "police deception during interrogation places innocent people at risk of falsely confessing" and that trivializing the <u>Miranda</u> warnings should "render any purported waiver . . . presumptively involuntary." The ACDL adds that "<u>Miranda</u> is not working and should be revisited and improved."

### III.

### A.

The Fifth Amendment to the United States Constitution guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." More than a half century ago, the United States Supreme Court imposed procedural safeguards to try to dispel the inherent pressures of

13

custodial interrogations and protect the right against self-incrimination. Miranda, 384 U.S. at 467, 478-79.  Under its landmark ruling in Miranda v. Arizona, the Court required that suspects be advised of the following now familiar warnings before they can be questioned in custody:

*that the person "has the right to remain silent";

*"that anything he says can be used against him in a court of law";

*"that he has the right to the presence of an attorney"; and

*"that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."  Id. at 479.

New Jersey's privilege against self-incrimination stems from the common law and is codified at N.J.S.A. 2A:84A-19 and N.J.R.E. 503.  The statute and evidence rule both provide that "every natural person has a right to refuse to disclose in an action or to a police officer or other official any matter that will incriminate him or expose him to a penalty or a forfeiture of his estate."

That principle is "venerated and deeply rooted" in our law, and we have treated it "as though it were of constitutional magnitude."  State v. O'Neill, 193 N.J. 148, 176 (2007).  We have also found that New Jersey's privilege "offers broader protection than" the Fifth Amendment.  State v. Ahmad, 246 N.J. 592, 610 (2021) (quoting O'Neill, 193 N.J. at 176-77).

14

Before the police can interrogate a suspect in custody, they must inform the person of his constitutional rights in accordance with Miranda. State v. Hreha, 217 N.J. 368, 382 (2014). The State must also prove beyond a reasonable doubt that the individual knowingly, intelligently, and voluntarily waived those rights "in light of all the circumstances." Sims, ___ N.J. at ___ (slip op. at 24) (quoting State v. Presha, 163 N.J. 304, 313 (2000)). That burden of proof is higher than under federal law, which requires the government to "prove waiver only by a preponderance of the evidence." Colorado v. Connelly, 479 U.S. 157, 168 (1986).

Under the totality-of-the-circumstances test, courts commonly consider a number of factors to determine if a Miranda waiver is valid. They include the suspect's "education and intelligence, age, familiarity with the criminal justice system, physical and mental condition, . . . drug and alcohol problems," how explicit the waiver was, and the amount of time between the reading of the rights and any admissions. 49 Geo. L.J. Ann. Rev. Crim. Proc. 233-36 (2020); Tillery, 238 N.J. at 317.

Beyond the issue of waiver, there are separate due process concerns related to the voluntariness of a confession. Due process requires the State to "prove beyond a reasonable doubt that a defendant's confession was voluntary

15

and was not made because the defendant's will was overborne." State v. L.H., 239 N.J. 22, 42 (2019) (quoting State v. Knight, 183 N.J. 449, 462 (2005)). The totality-of-the-circumstances test applies here as well, and "[t]here is a substantial overlap [with] the factors that" apply to a waiver analysis. Tillery, 238 N.J. at 316-17; see also Connelly, 479 U.S. at 169-70 ("There is obviously no reason to require more in the way of a 'voluntariness' inquiry in the Miranda waiver context than in the Fourteenth Amendment confession context."); L.H., 239 N.J. at 44 (listing factors); 49 Geo L.J. Ann. Rev. Crim. Proc. at 246-50 (listing factors).

Because the factors overlap, we consider case law relating both to waiver and the voluntariness of a confession to assess comments the police made during defendant's interrogation.

### B.

Courts have long recognized that "[a] police officer cannot directly contradict, out of one side of his mouth, the Miranda warnings just given out of the other." L.H., 239 N.J. at 44 (quoting State v. Pillar, 359 N.J. Super. 249, 268 (App. Div. 2003)). Certain remarks by the Hackensack detective are problematic under that simple standard.

Referring to Miranda warnings as a "formality," for example, downplays their significance. Doody v. Ryan, 649 F.3d 986, 1002-03 (9th Cir. 2011) (en

16

banc).  The label suggests that <u>Miranda</u> warnings are little more than a box on a bureaucratic checklist waiting to be checked off -- and that is simply wrong. <u>Miranda</u> warnings are a constitutional requirement meant to protect a person's rights under the Fifth Amendment; they are not a formality.  To describe them in that way minimizes their import and undermines "the very purpose of <u>Miranda</u>."  <u>Ross v. State</u>, 45 So. 3d 403, 428-30 (Fla. 2010) (criticizing a reference to the warnings as "just a matter of procedure").

Suggesting or promising that an interrogation will remain confidential is even more troubling.  To begin with, it directly contradicts one of <u>Miranda</u>'s core warnings:  that anything said "can be used against [a person] in a court of law."  384 U.S. at 479.  It comes as no surprise, then, that many courts have condemned assurances that a suspect's statements would remain confidential. <u>See, e.g.</u>, <u>Spence v. State</u>, 642 S.E.2d 856, 858 (Ga. 2007); <u>State v. McConkie</u>, 755 A.2d 1075, 1077-79 (Me. 2000); <u>Lee v. State</u>, 12 A.3d 1238, 1243-45, 1251 (Md. 2011); <u>Leger v. Commonwealth</u>, 400 S.W.3d 745, 748-49, 751 (Ky. 2013); <u>Hopkins v. Cockrell</u>, 325 F.3d 579, 584-85 (5th Cir. 2003); <u>see also</u> <u>State v. Hummel</u>, 232 N.J. 196, 214 (2018) (LaVecchia, J., concurring and dissenting).  Courts agree that misleading statements about confidentiality must be avoided because they impermissibly undercut the meaning of the <u>Miranda</u> warnings.

17

To suggest that statements "will not work against" or "will not be used against" a suspect raises similar concerns. Those types of comments are also at odds with Miranda's warning that a suspect's statements can in fact be used against the person. L.H., 239 N.J. at 44. Because representations to the contrary can mislead suspects about the consequences of speaking, courts have sharply criticized such remarks. See, e.g., ibid.; United States v. Lall, 607 F.3d 1277, 1283-84, 1287 (11th Cir. 2010); Linares v. State, 471 S.E.2d 208, 211-12 (Ga. 1996).

Finally, telling suspects that confessing "could not hurt" and "could only help" them also contradicts Miranda. State v. Puryear, 441 N.J. Super. 280, 298 (App. Div. 2015); see also State in Interest of A.S., 203 N.J. 131, 140, 151 (2010) (suppressing a statement in which a detective told a juvenile "[t]he truth is only going to help you," among other things). All defendants run the risk that their words will be used directly against them at trial to secure a conviction.

C.

In this appeal, a detective undermined the Miranda warnings in all of the above ways to try to elicit a confession. He twice told defendant the warnings were a "formality." He promised the defendant's words were "confidential between us" and would "stay[] between us." He assured defendant his words

were "not going to work against you." And he told defendant "[a]nything you say . . . is only going to help you; it's not going to hurt you." Those comments countered and diminished the significance of the <u>Miranda</u> warnings, and we disapprove of each of them.

Comments that contradict and hollow out <u>Miranda</u> warnings can negate their effectiveness and cast doubt on whether a defendant fully understood and knowingly waived his rights. That said, we continue to consider the totality of the circumstances to decide whether the State has proven beyond a reasonable doubt that a defendant knowingly, intelligently, and voluntarily waived his rights. <u>See</u> <u>Sims</u>, ___ N.J. at ___ (slip op. at 24).

We decline to adopt a bright-line rule that would require suppression any time an officer makes an improper comment during an interrogation. Such an approach would lead to the suppression of voluntary statements in a number of instances. In contrast, the totality-of-the-circumstances test can both root out improper police statements that result in an invalid waiver and recognize knowing and voluntary waivers.

Here, the Hackensack detective not only undermined the warnings immediately before he recited them, but he also contradicted them at various points throughout the interrogation. And even though the BCPO detective

19

partly restated the warnings at one point, none of the Hackensack detective's misstatements were expressly corrected during the interrogation.

As noted earlier, each of the comments reviewed above was at odds with Miranda's safeguards. Defendant was twice told the warnings were only a "formality." The first instance may have inoculated against the warnings in advance; the second came in direct response to defendant referring to and contemplating his rights. Those improper comments trivialized the warnings at key points in the interview.

Even more significant, telling defendant that any statements he made would remain confidential flatly contradicted his rights. The comment also prompted admissions about how steroid use caused defendant to do "silly things" and about the number of assaults. The detective's comment about confidentiality weighs heavily against the admissibility of the statement here -- as it should in other cases. Compounding the misstatement was the detective's later remark that "whatever" defendant said was "not going to work against" him.

Additionally, advising defendant that admissions were "only going to help" him and "not going to hurt" him further contorted the meaning of Miranda's constitutional safeguards. Together, as the Appellate Division

20

correctly observed, the misrepresentations call into question defendant's understanding of his rights.

We do not give much weight to defendant's contact with the criminal justice system twenty-five years beforehand. See Puryear, 441 N.J. Super. at 298. We recognize as part of the totality of the circumstances that he waived his rights at first, demonstrated some familiarity with them during the interrogation, knew he was being recorded, and ultimately invoked his right to counsel. We also note that defendant was forty-three years old, owned a trucking company, and was not subjected to prolonged questioning.

But we cannot isolate and minimize the string of misrepresentations in this case. Cumulatively, the number and significance of the detective's misleading statements undermined the Miranda warnings and, by extension, the voluntariness of defendant's waiver.

The State argues in the alternative that only statements made after the second improper comment -- the detective's promise of confidentiality -- should be suppressed. Defendant's interrogation, however, began with a misleading remark -- that the warnings were "[j]ust a formality" -- and that error was reinforced by yet more misrepresentations throughout the questioning. In the end, because of the detective's repeated and varied efforts to undermine the Miranda warnings, we agree with the Appellate Division that

21

the State did not shoulder its heavy burden and prove beyond a reasonable doubt that defendant's waiver was knowing, intelligent, and voluntary.

We therefore conclude defendant's statement must be suppressed in full. We give deference to the trial court's factual findings so long as they are supported by sufficient credible evidence in the record.  See State v. S.S., 229 N.J. 360, 379-81 (2017).  But we are not bound by the trial court's determination of the validity of the waiver, which is a legal, not a factual, question.  See Miller v. Fenton, 474 U.S. 104, 110 (1985) (noting the ultimate issue of the voluntariness of a confession is a legal question); Pillar, 359 N.J. Super. at 268 (same).

Because we find defendant's waiver was not knowing and voluntary under the circumstances, we do not consider the voluntariness of the statement on due process grounds.  Defendant's brief to the Appellate Division focused on the waiver issue, and the Appellate Division majority grounded its decision on that question.  The dissent likewise did not base its opinion on due process concerns.  See R. 2:2-1(a)(2) (allowing appeals as of right "with regard to those issues as to which[] there is a dissent"); State v. Micelli, 215 N.J. 284, 292 (2013) (limiting the scope of an appeal as of right to issues raised in the dissent).

IV.

For those reasons, we affirm the judgment of the Appellate Division and remand the matter to the trial court for further proceedings.


JUSTICES ALBIN, PATTERSON, SOLOMON, and PIERRE-LOUIS and JUDGE FUENTES (temporarily assigned) join in CHIEF JUSTICE RABNER's opinion.